COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                    TRIAL COURT
                                      SUPERIOR COURT DEPARTMENT
                                           CIVIL ACTION NO. _____

| | |
|---|---|
| MRS. ANN GAGLIARDI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SOVEREIGN BANK, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF MRS. ANN GAGLIARDI'S MOTION FOR PRELIMINARY INJUNCTION

Now comes the Plaintiff Mrs. Ann Gagliardi ("Mrs. Gagliardi") with this

Memorandum in Support of her Motion for Preliminary Injunction enjoining Sovereign

Bank's ("Sovereign") from moving forward in connection with foreclosure proceeding on

the property located at 331 Page Street, Stoughton, Massachusetts (the "Stoughton

Property"), as well as enjoining Sovereign from taking any actions or steps including

foreclosure in connection with illegal, and void mortgage, guarantee, and Assignment of

Leases and Rents illegally obtained from Plaintiff Mrs. Gagliardi by Sovereign.  The

Stoughton Property is owned by Mrs. Gagliardi and her husband as husband and wife,

tenancy by the entirety.  **The leases and rents earned by the Stoughton Property**

**represent nearly 100% of Mrs. Gagliardi and her husband's retirement income.**

**Antonio Gagliardi is a retired stonemason with a fifth grade Italian education.**

**Therefore the continued actions by Sovereign will result in an extraordinary and**

**irreparable damage and harm to Mrs. Gagliardi.  The actions of Sovereign have**

1

resulted in violations of Mrs. Gagliardi's civil rights under Federal law and in addition Sovereign's actions are void and unenforceable and in addition, all documents signed by Mrs. Gagliardi are void and unenforceable under the provisions of Federal and state law.  Therefore Mrs. Gagliardi seeks a preliminary injunction on the actions of Sovereign until this matter can be heard by the Court on its merits.

For the Court's convenience, attached as Exhibit A are the facts as alleged in the Complaint of Mrs. Ann Gagliardi.

## ARGUMENT

In determining whether to grant a preliminary injunction, the Court must consider the balancing test set forth in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-617 (1980). First, the court must evaluate, in combination, "the moving party's claim of injury and its chance of success on the merits." Id. at 617. If failing to issue the injunction "would subject the moving party to a substantial risk of irreparable harm, this court must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for opposing party." Id. "In the context of a preliminary injunction, the only rights which may be irreparably lost are those not capable of vindication by a final judgment, rendered either at law or in equity." Id. at 617 n. 11. Moreover, in appropriate cases the court should also consider the risk of harm to the public interest. GTE Products Corp. v. Stewart, 414 Mass. 721, 723 (1993); Biotti v. Board of Selectmen of Manchester, 25 Mass. App. Ct. 637, 649 (1988).

2

## Equal Credit Opportunity Act Renders Sovereign's Mortgages Void

The Plaintiff, Mrs. Gagliardi, as demonstrated below, has made a prima facie case particularly as it relates to Sovereign's violation of Federal law. She is not expected to predict her victory with certainty to survive scrutiny under the preliminary injunction standard. Shammas v. Merchants National Bank, No. 90-12217N, 1990 WL 354452 (D. Mass. November 9, 1990) citing 11 C. Wright & Miller §2948 at 452 (1973). In evaluating Mrs. Gagliardi's claims and the evidence presented, there is a likelihood of success on the merits particularly since Sovereign required Plaintiff to guarantee a loan for the benefit of her husband in violation of the antidiscriminatory provisions of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §1691. [Plaintiff's other claims include M.G.L. ch. 93A, Intentional Infliction of Emotional Distress, Fraud, Misrepresentation, the Bank Holding Company Act, 12 USCA § 1972 (1)(B-D).]

The ECOA provides that it is unlawful "for any creditor to discriminate against any [credit] applicant with respect to any aspect of a credit transaction on the basis of...marital status." 15 U.S.C. §1691 (a)(1). (Emphasis supplied) Regulations promulgated under the authority of the ECOA state that "[a] creditor shall not require the signature of an applicant's spouse or any other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. §202.7 (d)(1). An applicant is defined under the ECOA as "any person who requests or who has received an extension of credit from a creditor, and...[f]or purposes of §202.7(d), the term includes guarantors, sureties, endorsers and similar parties." 12 C.F.R. §202.2 (e).

Mrs. Gagliardi has stated in her Affidavit that she neither sought, asked for or applied for any credit from Sovereign. The civil liability provision in ECOA provides an aggrieved applicant with an affirmative cause of action, which must be brought no later than two years from the date of the occurrence of the violation. 15 U.S.C. §1691e (f). In addition, the ECOA grants the court of competent jurisdiction the authority to "[g]rant such equitable and declaratory relief as necessary to enforce the requirements imposed under [ECOA]." 15 U.S.C. sec 1691 (c).

The Statute of Limitations for bringing an ECOA claim is two years from the date of the alleged violation. The initial loan transaction in which the bank illegally demanded a Non-Encumbrance Agreement occurred in 2001. The Non-Encumbrance Agreement may well be a "credit instrument" since it was illegal given as a guarantee that the Stoughton Property would back the original debt. Accordingly the violation under ECOA as it relates to the Non-Encumbrance Agreement is more than two years before this Motion. See Ramsdell v. Bowles, 64 F.3d 5, 9 (1st Cir 1995); Farrell v. Bank of New Hampshire Portsmouth, 929 F.2d 871, 873 (1st Cir.). To the extent that the Non-Encumbrance Agreement is a violation of ECOA, the raising of ECOA is not in the nature of an affirmative claim but rather as a defense of any attempt to enforce the Non-Encumbrance Agreement.

ECOA is always an affirmative defense to the enforceability to the mortgages which are the subject of pending foreclosure proceeding on the Stoughton Property. Regardless of the Statute of Limitations, ECOA is also a cause of action for damages in connection with the violation of Mrs. Gagliardi's civil rights (ECOA is a civil rights statute). Because said mortgages were allegedly given on July 16, 2004, there is no

4

statute of limitations issue for an affirmative claim. Notwithstanding the absence of a

statute of limitation issue as it relates to the Stoughton mortgage and Mrs. Gagliardi's

guarantee, it is worth considering that Massachusetts and other state courts as well as

Federal courts have extensively considered the importance of ECOA as a defense <u>even</u>

<u>when the statute of limitations has run</u>. In this regard the Court should consider the

following analysis:

> Congress…in enacting ECOA…intended that creditors not affirmatively
> benefit from proscribed acts of credit discrimination. **To permit
> creditors…especially sophisticated institutions…to affirmatively
> benefit by disregarding the requirements of ECOA would seriously
> undermine the Congressional Intent to eradicate gender and marital
> status based credit discrimination.**

<u>Integra Bank/Pittsburgh</u>, 389 F.Supp. at 329 (1993) (emphasis supplied). See also, <u>Sony</u>

<u>Electronics, Inc., v. Putnam</u>, 906 F.Supp. 228, 229 (D.N.J. 1995); <u>FDIC v. Medmark</u>, 897

F.Supp. 511, 514 (D. Kan. 1995); <u>American Security Bank v. York</u>, 91-921, 1992 WL

237375, at *8 (E.D. Mich. 1994); <u>Mundaca Inv. Corp. v. Emory</u>, 674 A2d 923, 925 (Me.

1996); <u>FDIC v. Notis</u>, 602 A2d 1164, 1165-1166 (Me. 1992). See also <u>Kodis v. State</u>

<u>Street Bank and Trust Company</u>, Civil Action No. 96-1637, Grabauj attached.

The interpretation of these courts focuses on ECOA's inclusion of a broad

remedial provision. These courts have concluded that "…an offending creditor should

not be permitted to look for payment to parties who but for the ECOA violation, would

not have incurred personal liability on the underlying debt in the first instance." <u>Integra</u>

<u>Bank/Pittsburgh</u>, 389 F.Supp. at 329 (1993). Obviously, before July 16, 2004, Sovereign

had loaned over 2.6 million dollars <u>without</u> a guarantee of Mrs. Gagliardi and the

mortgage on the Stoughton Property. Obviously, Sovereign had loaned over 2.6 million

dollars to AMG without securing it with a mortgage on the Framingham and Stoughton

Properties. Since the mortgage on the Stoughton Property was given to secure Mrs.

Gagliardi's Guarantee, the loss of the guarantee and the mortgage securing it will not

materially effect Sovereign because Mrs. Gagliardi, in the absence of Sovereign's

violation of ECOA, would not have incurred any personal liability in connection with her

husband's or AMG's debt.

Since Mrs. Gagliardi Gagliardi has a valid defense and is likely to obtain relief

from her obligations under the guarantee, the mortgage and the Assignment of Leases and

Rents, then a preliminary injunction should be granted. Having granted the preliminary

injunction the Court is not necessarily determining that the underlying debt of AMG is

necessarily void. That issue is also the subject of this litigation, however this Court can

clearly issue an injunction without having to decide the validity of AMG's obligations.

Issuing the injunction will simply put Sovereign in no worse than it was in prior

to the alleged signing of the illegal documents on July 16, 2004. As the court in Integra

commented:

> [t]his rule places a creditor in no worse position than if it had adhered to
> the law when the credit transaction had occurred. A creditor may not
> claim to have relied factually upon a guarantor's assets if it was never
> requested nor received financial information regarding them. Further a
> creditor may not claim legal reliance on a signature that it was illegally
> required in the first place. Id. at 329.

As can be seen by the affidavit of Mrs. Gagliardi at no time did she ever request a

loan. At no time did she ever fill out any financial information concerning her assets.

Therefore, Sovereign may not claim to have detrimentally relied on her assets since

Sovereign never asked for nor received financial information from Mrs. Gagliardi.

## PLAINTIFF MUST PREVAIL BECAUSE SOVEREIGN NEVER COMPLIED WITH ECOA REQUIREMENTS CONCERNING "CREDITWORTHINESS"

The "creditworthiness" of the applicant is an important component of ECOA. In order to demonstrate that Sovereign met the requirements of the statute, Sovereign would have to produce a creditworthiness analysis showing that AMG, as the applicant for credit, was not creditworthy. Further, the analysis would have to show that AMG and Antonio (Plaintiff's husband), and Anthony (Plaintiff's son), were not creditworthy for the credit being extended. The problem for Sovereign in this regard is that apparently AMG was already in default. Sovereign "hid" the defaulted loan by creating the 1.6 Million Dollar Note and the 1 Million Dollar Note which has no default language contained therein. In other words, Sovereign concocted a loan transaction under which normal creditworthy analysis was never even considered. Therefore, the creditworthiness analysis of Mrs. Gagliardi never took place. The facts outlined above demonstrate the extraordinary lengths that Sovereign went to "hide" their unsecured defaulted loan. Sovereign undertook to make two new loans (1.6 Million Dollar Note and 1 Million Dollar Note) on July 16, 2004, which "apparently" paid off the 2.6 million dollars already in default. Sovereign is now estopped from trying to claim that AMG was not creditworthy for those newly entered into notes for July 16, 2004. To do so, would in fact be an admission of their duplicitous and illegal scheme.

A precise standard for determining creditworthiness is not provided by ECOA or its regulations. "It appears that a creditor is permitted to make a determination by its own standards, as long as they are nondiscriminating with regard to the applicants marital status." Shammas v. Merchants National Bank, No. 90-12217N, 1990 WL 354452 at *3 (D. Mass. 1990). "The legislative history of ECOA, however, does state that creditors are expected to use 'valid and reasonable criteria' in their evaluation of

creditworthiness." Id. quoting Haynes v. Bank of Wedowee, 634 F.2d. 266, 270 (5th Cir. 1981) citing S. Rep. No. 278, 93rd Cong., 1st Sess. (1973). Kodis at p. 11. This "valid and reasonable criteria" is further required by the Federal Reserve Bank rules requiring safety and soundness in the lending and underwriting requirement for all federally insured banks. 12 CFR 365, Appendix A. Again, Sovereign, in attempting to justify the illegal signature of Mrs. Gagliardi would in effect be admitting that without her signature the grant of credit would have been unsafe and unsound. The problem for Sovereign is that it already knew that the loan was unsafe and unsound and it never undertook an evaluation of what "creditworthiness" Mrs. Gagliardi would have brought to the underwriting of the loan, since she never sought, applied for or requested the so called extension of credit.

## PUBLIC POLICY REQUIRES AN INJUNCTION

It is worth considering that the United States Congress has demonstrated its concern about bank documents which are part of a attempt to conceal or cover up material facts that exist in a particular loan arrangement. 18 U.S.C.A. §101 makes it a crime for the bank, or anyone, to knowingly and willfully falsify, conceal or cover-up by trick, scheme or device, a material fact in a loan:

> Whoever in any manner within the jurisdiction of any department or agency of the United States knowingly or willfully, falsifies, conceals or covers ups by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any faults, fictitious or fraudulent statement or entry shall be fined not more than $10,000 or imprisoned not more than 5 years or both.

In the instant case, it appears clear that the Forbearance Agreement, the 1.6 Million Dollar Note, the 1 Million Dollar Note, all were drafted, issued and signed as a

8

result of a cover up concocted by Sovereign to conceal material facts concerning the debt Sovereign's actions amounts to an obvious and deliberate attempt to avoid safety and soundness standards, in order to avoid taking a loss on a clearly defaulted loan. In addition, it appears that there is a substantial violation of the Banking Holding Company Act 12 USC §1972 as a it relates to Sovereign's illegal and inappropriate "tying" the requirement of Mrs. Gagliardi's Guarantee to the possible loan to Antonio of $150,000 as a "investment" in AMG which Sovereign illegally offered. See Complaint paragraph 55. Mrs. Gagliardi has stated a cause of action against Sovereign for allegedly tying the provision of her guarantee to its Forbearance Agreement. See Nordick Bank PLC v. Trend Group Limited, 619 F. Supp. 542, 555 (D.C. N.Y. 1985). Congress has determined that "tying" a requirement of additional guarantees to the offering of bank product services or credit may be illegal. In addition, to these violations, the two notes are intended to cover up by trick and scheme, the material fact that AMG had been in default for many months, if not years. Equally clear is the fact that Sovereign's entire scheme included obtaining the illegal guarantee of Mrs. Gagliardi as well as the illegal mortgage and Assignment of Leases and Rents. Public policy require that the enforcement of documents associated with Sovereign's illegal efforts be void. Naturally, this would exist even if the ECOA defense were not available to Mrs. Gagliardi, which of course it is.

## RISK OF HARM ANALYSIS

As part of this Court's analysis of the preliminary injunction test, the Court must balance the risk of harm to Mrs. Gagliardi against any similar risk of irreparable harm which granting the injunction would create for Sovereign. Irreparable injury has been

9

defined as " a loss of rights that cannot be vindicated should [the moving party] prevail

after a full hearing on the merits." Packing Indus. Group, Inc., 380 Mass at 616. The

taking and sale of person's real property which is inherently unique is almost always

irreparable harm. Shammus, 1990 WL 3544552 at *5. "as a general rule, interference

with the enjoyment or the possession of land is considered 'irreparable' since land is

viewed as a unique commodity for which monetary compensation is an inadequate

substitute." Id. at quoting Pelfresne v. Village of Williams Bay, 865 F.2d. 877, 883 (7th

Cir. 1989) citing United Church of the Medical Center v. Medical Center Comm'n, 689

F.2d 693, 701 (7th Cir. 1982). By this standard the foreclosure on the Stoughton Property

would constitute irreparable harm. In addition, the interference in Mrs. Gagliardi's

income resulting from the loss of the lease and rents generated by the Stoughton property,

would also be an interference with the "enjoyment" of the land. Conversely, Sovereign

cannot allege any irreparable harm. Prior to July 16, 2004, a mere six months ago,

Sovereign had already loaned the 2.6 million dollars without the mortgage on the

Stoughton Property. The original 2.6 million dollars was apparently lent beginning in

2001. The Stoughton and Framingham Properties, were never components of

Sovereign's decision to lend 2.6 million dollars to AMG in 2001. These properties only

became relevant in 2004 when Sovereign realized it could not recover on the loan and

was facing total loss since there was no collateral and undertook the scheme to get Mrs.

Gagliardi's signature, on an illegal guarantee, mortgage and Assignment of Leases and

Rents. **It must be remembered that in exchange for Mrs. Gagliardi signing the**

**illegal guarantee, mortgage and Assignment of Leases and Rents Mrs. Gagliardi**

**received nothing in return. She never received any of the proceeds of the 2.6 million**

**dollars apparently dispersed by Sovereign to AMG. She had never been an applicant for the 2.6 million dollars in 2001, nor for the new notes of 1.6 Million and 1 Million Dollar Notes in 2004. There was absolutely no consideration supporting Mrs. Gagliardi's signature on the guarantee, mortgage or the Assignment of Leases and Rents.** It is worth again considering the Integra court's language, which states that, Congress, in enacting ECOA, intended that creditors not affirmatively benefit from the proscribed acts, it can not be denied that Sovereign can only achieve a "benefit" if it can liquidate Mrs. Gagliardi's property. It can not be denied that virtually every other aspect of Sovereign's loan to AMG is functionally unsecured and uncollectable. In effect, Sovereign is attempting to affirmatively benefit by their decision to violate ECOA and numerous other banking laws in the blatant and frantic attempt to collateralize a loan that had already been in default for many years. This is exactly what Congress intended to prevent.

## CONCLUSION

Mrs. Gagliardi has demonstrated her likelihood success on the merits, irreparable harm if an injunction is not issued and that Sovereign will not suffer irreparable harm if the injunction is issues. Public policy requires that if Sovereign at the conclusion of the trial on the merits violated ECOA, the Bank Holding Company Act, the Code of Federal Regulations, and M.G.L. 93A, that not only will Mrs. Gagliardi be entitled to maintain the Stoughton Property, she will also have affirmative claims for damages against Sovereign. Mrs. Gagliardi respectfully requests the foreclosure of the Stoughton Property be enjoined until the trial on the merits can be concluded.

Respectfully Submitted,

Mrs. Ann Gagliardi,
By her counsel,

Dated: March 31, 2005

Michael C. McLaughlin (BBO# 367350)
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 227-2275

Certificate of Service

I hereby certify that a true copy of the above document
was served upon the attorney of record for each party
by mail / by hand

Michael C. McLaughlin

12

## EXHIBIT A

## PARTIES

1.  Plaintiff Mrs. Ann Gagliardi ("Mrs. Gagliardi") is an individual residing at 411 South Avenue, Weston, Middlesex County, Massachusetts.

2.  Defendant Sovereign Bank ("Sovereign") is, upon information and belief, a federal savings bank, organized and existing under the laws of the United States of America, with a usual place of business at 75 State Street, Boston, Suffolk County, Massachusetts.

## FACTS

3.  AMG Construction Company ("AMG") is a corporation organized and existing under the laws of Massachusetts, with the usual place of business 615 Concord Street, Framingham, Middlesex County, Massachusetts. On or about July 30, 2001, AMG, upon information and belief entered into a "revolving line of credit" between itself and Sovereign.

4.  Anthony Gagliardi ("Anthony") is the president of AMG and the son of Mrs. Gagliardi and Antonio Gagliardi.

5.  The revolving line of credit was allegedly memorialized with a line of credit note in the amount of 2 million dollars ("the 2 Million Dollar Note").

6.  Also on or about July 30, 2001, AMG entered into an "equipment line of credit note" in the amount of $200,000.00 ("the $200,000.00 Equipment Line of Credit Note").

7.  Upon information and belief, AMG also entered into a loan and security agreement dated July 30, 2001 ("the Loan and Security Agreement").

1

8.  Antonio Gagliardi ("Antonio") is the husband of Mrs. Gagliardi and is an individual residing at 411 South Avenue, Weston, Middlesex County, Massachusetts. Upon information and belief, Sovereign claims to have an "unlimited guarantee" of Antonio, signed on July 30, 2001, whereby Antonio guaranteed the debt of AMG.

9.  Antonio, an Italian immigrant with a fifth grade Italian education, is a former stonemason now retired.

10. Mrs. Gagliardi at all times relevant to these matters was neither a shareholder, officer nor director of AMG.

11. On or about July 30, 2001, despite the fact that Mrs. Gagliardi had no connection to AMG or to any application for any credit from Sovereign, Sovereign nevertheless required Mrs. Gagliardi and Antonio to sign a non-encumbrance agreement by which Mrs. Gagliardi and Antonio promised not to encumber property located at located at 331 Page Street, Stoughton, Massachusetts, which was owned by Antonio and Mrs. Gagliardi as husband and wife, tenancy by the entirety ("the Stoughton Property"). The Stoughton Property is a commercial property where the income of the property represents the vast majority of Antonio and Mrs. Gagliardi's retirement funds.

12. Upon information and belief, AMG was unable to pay back the 2 Million Dollar Note and was unable to pay back the $200,000.00 Equipment Line of Credit Note.

13. Upon information and belief, Sovereign on several occasions increased the 2 Million Dollar Note and the $200,000.00 Equipment Line of Credit Note until the total combined indebtedness exceeded $2,600,000.000.

2

14. According to the Loan and Security Agreement between itself and AMG, Sovereign failed to obtain any real estate security. Rather, Sovereign limited its security to receivables of AMG.

15. While Sovereign required the non-encumbrance agreement, from Antonio and Mrs. Gagliardi, it did not obtain a mortgage on the Stoughton Property in 2001.

16. Upon information and belief, Sovereign realized that AMG could not repay the obligations that existed under the 2 Million Dollar Note and the $200,000.00 Equipment Line of Credit Note, because, it had no claims against any real estate as security and AMG had virtually no receivables that could in any significant way offset Sovereign's claim totaling 2.6 million dollars.

17. Upon information and belief, Sovereign under federal banking laws was required to make certain accounting adjustments in connection with the AMG debt because it had become in large part uncollectable. Upon information and belief, such accounting adjustments included the recording of a loss in the amount that could include the entire $2.6 million debt of AMG. This was required because Sovereign had virtually nothing to foreclose on once it realized that AMG could not repay the 2.6 million dollars.

18. Upon information and belief, Sovereign in 2004 began a course of action intended to defraud, mislead, misrepresent the status of the 2.6 million dollar debt not only to Mrs. Gagliardi but to the federal and state banking authorities in order to cause Mrs. Gagliardi to sign an illegal guarantee and a mortgage on the Stoughton Property.

19. The course of action included the drafting of illegal and misrepresentative new loan documents which were intended to fraudulently mislead Mrs. Gagliardi and others

3

so that Sovereign could convert its now worthless loan into an illegally secured real estate loan.

20. Upon information and belief, sometime in 2004 Sovereign had been informed by AMG that AMG could not repay the loan. In addition, during the same time period, AMG lost its ability to secure any bonding for public construction projects which were the primary source of income for AMG. Sovereign was informed by AMG that because of the loss of its bonding capacity AMG would not be able to continue on public construction projects and therefore AMG had lost the vast majority of its income.

21. Upon information and belief, Sovereign was so informed by AMG at or about the time that Sovereign was or had been required under federal and state banking laws and accounting standards to take the loss on its unsecured loans to AMG.

22. Upon information and belief, Sovereign was aware that the so called unlimited guarantee of Antonio was virtually worthless because the only assets of Antonio were held by Antonio and Mrs. Gagliardi as husband and wife, tenancy by the entirety. This fact was always known by Sovereign as demonstrated by the fact that Sovereign drafted and recorded at the Norfolk County Registry of Deeds the non-encumbrance agreement for the Stoughton Property thus putting the world on notice of the tenancy by the entirety form of ownership of the Gagliardis.

23. Sovereign knew it could not enforce the so called unlimited guarantee of Antonio because Sovereign could not effectuate a sale of the Stoughton Property even if Antonio's unlimited guarantee was valid because under Massachusetts law Mrs. Gagliardi retained an undivided interest in the property.

24. Upon information and belief, Sovereign was also aware that it could not collect on the so called unlimited guarantee of Antonio as it related to Antonio's only other property, his home in Weston, Massachusetts, since the home was also owned by Antonio and Mrs. Gagliardi, husband and wife, tenancy by the entirety.

25. Upon information and belief on or about the early spring of 2004, Anthony Gagliardi, president of AMG entered into numerous conversations with Sovereign. Upon information and belief, Anthony repeatedly informed Sovereign that given the financial condition of AMG it would be virtually impossible to obtain bonding commitments in order to resume construction work. Upon information and belief, Anthony Gagliardi also informed Sovereign that he saw no possibility of the company earning any money for the fiscal year 2004.

26. Sovereign aware that it was without any viable option offered to extend the time for the repayment for the 2.6 million dollars. Sovereign had no option but to do so since there was no collateral to foreclose on it.

27. On or about July 16, 2004, Sovereign required AMG and Antonio and Mrs. Gagliardi to attend a closing at Reimer & Braunstein to sign specific documents which prior to the closing neither Antonio nor Mrs. Gagliardi had ever reviewed, read or analyzed.

28. Sovereign was fully aware that Antonio had extremely limited understanding of English and virtually no understanding of legal documents. Further Sovereign knew that Antonio and Mrs. Gagliardi were not represented by counsel.

5

29. Sovereign produced misleading, illegal and void documents with the express purpose of causing Antonio and his wife Mrs. Gagliardi to sign documents that violated federal and state law.

30. Included in the documents, signed on or about July 16, 2004, were two notes, one in the amount 1,600,000.00 ("the 1.6 Million Dollar Note") and the other in the amount of 1,005,264.46 ("the 1 Million Dollar Note") which were allegedly signed by AMG thus eliminating by payment in full the Two Million Dollar Line of Credit Note, as amended and the $200,000.00 Equipment Line of Credit Note, as amended.

31. The 1.6 Million Note and the 1 Million Dollar Note contain no interest rate, no maturity date, no payment schedule, no repayment amounts on a monthly basis and no reference to the fact that both notes were already in default at the time they were signed on July 16, 2004, nor did they disclose that the alleged 2.6 Million Dollar AMG obligation to Sovereign was in default.

32. Upon information and belief, under federally approved and required banking standards, the 1.6 Million Note and the 1 Million Dollar Note eliminated the prior $2.6 million obligation. To the extent that Antonio's alleged unlimited guarantee was applicable to the 2 Million Line of Credit as amended or the $200,000.00 Line of Credit as amended that applicability was completely and entirely relieved by the signing of the 1.6 Million Dollar Note and the 1 Million Dollar Note.

33. The 1.6 Million Dollar Note and the 1 Million Dollar Note were drafted on July 16, 2004, for the illegal purpose of depicting AMG, as not being in default. Upon information and belief, since the 1.6 Million Dollar Note and the 1 Million Dollar Note made no reference as to the fact that the prior debt had been in default for several years,

6

Sovereign concocted a theory whereby disclosure of the status of the long defaulted

AMG loan to banking authorities, could be avoided. In addition, upon information and

belief, Sovereign in drafting the 1.6 Million Dollar Note and the 1 Million Dollar Note

believed that the appearance of no default would cause a bonding company to consider

bonding AMG since a review of the 1.6 Million Dollar Note and the 1 Million Dollar

Note suggested that AMG had just been paid a total of 2.6 million dollars by the bank and

no default had occurred. In fact, Sovereign did not give, disburse or otherwise transfer

1.6 million or 1 million to AMG on July 16, 2004 or at any time subsequent.

34. The 1.6 Million Dollar Note and the 1 Million Dollar Note were deliberately

and misleadingly drafted by Sovereign as evidence of AMG's ability to meets its

obligations.

35. Sovereign in support of the 1.6 and 1 Million Dollar Notes drafted and caused

to be signed a series of documents violative of federal and state law.

36. Included in these illegal documents is an illegal so called "limited recourse

guarantee", dated July 16, 2004, (Mrs. Gagliardi's Guarantee) which Sovereign required

Mrs. Gagliardi to sign notwithstanding the fact that Sovereign knew or should have

known that such a guarantee violated the Equal Credit Opportunity Act (15 U.S.C. §.

1691) ("ECOA"). At no time did Mrs. Gagliardi seek, request or apply for any credit or

any extension of Credit from Sovereign.

37. At no time did Mrs. Gagliardi seek, request or obtain any application for credit

from Sovereign.

38. Sovereign specifically required that Mrs. Gagliardi execute and deliver the

illegal guarantee.

39. Mrs. Gagliardi's guarantee secured the obligation of her husband Antonio.

40. A component of Mrs. Gagliardi's Guarantee was to ensure that Mrs. Gagliardi could not receive any funds that were owed and remained owed to Mrs. Gagliardi by AMG. As a result Sovereign prevented Mrs. Gagliardi from being paid monies that were owed to her.

41. In addition, Mrs. Gagliardi's Guarantee also required that Mrs. Gagliardi, who was unrelated to AMG by way of employment or ownership, was required, under the terms of the illegal guarantee, to become the "trustee" of the Sovereign's interest in connection with any amounts of money that came to Mrs. Gagliardi as a result of AMG's obligations to Mrs. Gagliardi. This requirement that Mrs. Gagliardi become a trustee for Sovereign was unconscionable and was without consideration.

42. Sovereign, aware of Antonio's lack of understanding and capacity in connection with documents signed by Antonio in the past as well as his lack of capacity in signing the documents at the closing, included a provision in Mrs. Gagliardi's Guarantee in which she guaranteed the 1.6 Million Dollar Note and 1 Million Dollar Note even if her co-guarantor i.e. her husband, Antonio, was incapacitated.

43. Sovereign undertook no credit worthiness analysis of Mrs. Gagliardi as required by ECOA.

44. An illegal mortgage signed by Mrs. Gagliardi and Antonio for the Stoughton Property where said mortgage was given to illegally secure Mrs. Gagliardi's illegal Guarantee of the obligations of her husband. As such not only is Mrs. Gagliardi's Guarantee illegal and unenforceable so is the mortgage on the Stoughton Property.

8

45. Sovereign, aware that the original 2.6 million dollar debt had been paid off by the 1.6 Million Dollar Note and the 1 Million Dollar Note caused Antonio to sign a document entitled Ratification of Guarantee dated July 16, 2004 whereby Sovereign attempted to cause Antonio to issue a new guarantee of the illegal 1.6 Million and 1 Million Dollar Notes. Said Ratification of Guarantee is in itself unenforceable and against public policy because it purports to bind Antonio into guaranteeing illegal, unenforceable and void documents which violate federal and state law as well as public policy.

46. Sovereign, aware that it had no collateral in the absence of causing these illegal documents to be signed also caused Antonio and Mrs. Gagliardi to further secure her illegal guarantee by obtaining an Assignment of Leases and Rents for the Stoughton Property whereby Sovereign sought to access the retirement funds produced by the Stoughton Property to pay off some portion of the illegal 1.6 Million Dollar Note and the 1 Million Dollar Note. The Assignment of Leases and Rents is illegal, unenforceable and violative of ECOA and state law as well as public policy.

47. Sovereign, in furtherance of its illegal undertaking drafted a document entitled Forbearance Agreement dated July 16, 2004 ("the Forbearance Agreement") which on its face was illegal, void and against public policy and was drafted for the purposes of deceiving not only Mrs. Gagliardi and Antonio but also federal and state banking authorities.

48. Under the provisions of federal law, Sovereign is required to use "safe and sound banking practices" in making loans, renewals of loans, refinancing or restructuring of loans. The Code of Federal Regulations, 12 CFR 365, Appendix A, requires that such

9

safety and soundness standards must be applied including matters relating to the extension of credit.

49. The Forbearance Agreement is deliberately, deceptively and unfairly drafted in knowing violation of safety and soundness practices in order to give the appearance of normal banking procedure to all but the most sophisticated of readers.

50. Safety and soundness practices would require a lender, prior to the extension of credit, verifying the borrower's ability to repay, evaluating the borrower's business plan and evaluating and approving the borrower's then current credit rating. Such safety and soundness practices, are self evident but nevertheless are required under the federal regulations.

51. Notwithstanding the self evident nature of safety and soundness practices Sovereign supposedly approved the "extension of credit" whereby its own Forbearance Agreement states unequivocally that it has not reviewed a business plan, and therefore in effect acknowledged that it has no basis for reasonably believing that AMG could repay the loan. The Forebearance Agreement states that Sovereign has not determined that AMG's credit was sufficient to be bondable, and therefore had no basis for believing that AMG could derive any income from public construction projects, which was AMG's only significant source of revenue. The Forebearance Agreement contains other provisions which demonstrate there could be no good faith evaluation of the credit worthiness of AMG.

52. The Forbearance Agreement dated August 16, 2004 by its own terms was in multiple material default prior to it even being signed.

53. The Forbearance Agreement contains a provision which states that Sovereign's extension of credit was contingent upon the subsequent submission by AMG of an approved business plan which would demonstrate that AMG has a capacity to repay the loan. Upon information and belief, the business plan which was to be submitted weeks after the signing of the Forbearance Agreement, in fact demonstrated that AMG could not repay the loan. Upon information and belief, the business planner, the financial consultant accepted and approved by Sovereign for the purposes of submitting AMG's business plan, informed Sovereign that AMG could not repay the loan. As a result the Forbearance Agreement was in default prior to it being signed. This information was already known to Sovereign prior to signing the Forbearance Agreement, and yet not disclosed to Mrs. Gagliardi by Sovereign Bank.

54. The Forbearance Agreement also included provisions whereby Sovereign agreed to lend money to "investors" who would be willing to invest $400,000.00 into AMG and that Sovereign would finance such investment even though such financing would most certainly violate safety and soundness provisions of the Federal Code of Regulations since Sovereign knew that AMG was in default on 2.6 million dollars of debt. The offer to finance "investors" purchases of stock in AMG would by definition require AMG to use the 1.6 Million Dollar Note and the 1 Million Dollar Note as evidence that no default existed even though Sovereign was aware that 2.6 million default was "eliminated" by the signed of the bogus and illegal 1.6 Million Dollar Note and the 1 Million Dollar Note. Since Sovereign knew under safety and soundness standards that Sovereign could never make such loans to investors, then they also knew that the Forbearance Agreement was in default before it was signed.

11

55. The Forbearance Agreement had another illegal provision whereby it linked the Antonio's Ratification of Guarantee and Mrs. Gagliardi's Guarantee to a loan of $150,000.00 to Antonio for the purpose of an investment in AMG as "equity" provided Antonio applied for the Sovereign loan of $150,000.00 by July 15, 2004. Since Antonio, to the extent he could even read the Forbearance Agreement, which he could not, did not see the Forbearance Agreement until July 16, 2004, he could never have complied with the requirement that he apply for the loan the day before he first saw the Forbearance Agreement. This linking of the Guarantee and the "investment loan" violates provisions of the Bank Holding Company Act, 12 U.S.C. 1972.

56. Upon information and belief, Sovereign required Anthony Gagliardi as trustee of the Anthony & Company Realty Trust to issue a mortgage on property located at 615 Concord Street, Framingham, Massachusetts ("the Framingham Property"). The sole beneficiary of the Anthony & Company Realty Trust is Mrs. Ann Gagliardi.

57. Sovereign deliberately included the bogus provisions subsequent to closing, i.e. an acceptable business plan, the of $400,000.00 to investors and the requirement that AMG receive a $5,000,000 (5 Million) bonding capacity could not be met and were not met as required by the Forbearance Agreement. Sovereign was unquestionably aware that AMG's "default" on the 2.6 Million obligation would absolutely prevent any surety from issuing a $5,000,000 bond

58. As a result of all of the above, the 1.6 Million Dollar Note, the 1 Million Dollar Note, the Forbearance Agreement and all supporting documents, including the loan security agreement are void, illegal and against public policy, thus rendering Mrs. Gagliardi's unlimited guarantee of such documents void.

12

59. Upon information and belief, notwithstanding the language in Mrs. Gagliardi's illegal Guarantee which purports to limit Sovereign's recovery against Mrs. Gagliardi to her share of the proceeds in the Stoughton Property, an undivided interest, and therefore impossible.