UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANN GAGLIARDI
    Plaintiff

v.                                                  Civil Action No.
                                                    05-10859-NG

SOVEREIGN BANK
    Defendant

**DEFENDANT'S OPPOSITION TO MOTION**
**FOR PRELIMINARY INJUNCTION**

Defendant Sovereign Bank ("Sovereign" or "the bank") opposes the Motion for Preliminary Injunction filed by plaintiff Ann Gagliardi ("Ann Gagliardi"). Ann Gagliardi seeks to enjoin the foreclosure of commercial property located at 331 Page Street in Stoughton, Massachusetts. She and her husband, Antonio Gagliardi, jointly own the property, and they granted Sovereign a mortgage on the property to secure their guaranties of a loan.

The loan is in default. Sovereign has exercised its rights and remedies under the various loan documents, described below, by commencing a collection action in Suffolk Superior Court, and obtaining judgments of foreclosure on the collateral properties. Despite plaintiff's allegations of a violation of the Equal Credit Opportunity Act, at all times Sovereign acted well within the bounds of applicable law, and there is no basis for this court to find that a violation occurred. Accordingly, plaintiff will not be able to prevail on the allegations of its complaint and can not meet the standard for obtaining a preliminary injunction.

I.  **FACTS**

    A.  **The Loan Documents**

This case involves a defaulted loan on which over $2.6 million is owed to Sovereign. The loan was made on or about July 30, 2001, when Sovereign granted a revolving line of credit to AMG Construction Company, Inc. ("AMG"). AMG is a construction company run by Anthony Gagliardi. His father, Antonio Gagliardi, is a shareholder and director of the corporation. AMG is in the construction business, and when the loan was made, had numerous contracts with municipalities for construction of schools and other public buildings.

The loan arrangements were evidenced by the following documents (collectively referred to as the "Loan Documents"):

- a Loan and Security Agreement executed by AMG and Sovereign (Exhibit 1)[1];

- a Revolving Credit Note executed by AMG in the amount of $2,600,000 (Exhibit 2);

- an Equipment Line Note executed by AMG in the amount of $200,000 (Exhibit 3);

- an Unlimited Guaranty executed by Antonio Gagliardi (Exhibit 4);

- an Unlimited Guaranty executed by Anthony Gagliardi (Exhibit 5);

- and a Non-Encumbrance Agreement executed by Ann Gagliardi and Antonio Gagliardi (Exhibit 6).

---

[1] All exhibits are attached to the Affidavit of Bret E. Bokelkamp (the "Bokelkamp Affidavit") submitted in opposition to plaintiff's Motion for Preliminary Injunction.

The loan arrangement between AMG and Sovereign was a revolving line of credit, as described in Exhibit 1. (See, in particular, Article 2, p. 15 et seq.) AMG was entitled to draw against the line of credit an amount equal to the *lesser* of (i) the principal amount of the note, or (ii) 80% of the acceptable accounts receivable. In the event AMG drew more under the line of credit than was available under the formula, AMG was required to pay Sovereign the amount by which the outstanding balance exceeded availability (Section 2.6 of Exhibit 1).

Only certain of AMG's accounts receivable were eligible to be considered in the calculation of the amount that could be drawn. "Acceptable Accounts" was a term defined in the Loan and Security Agreement (Article 1, p. 1 of Exhibit 1) as those not outstanding more than 90 days past the invoice date. Ineligible accounts receivable included those that were more than 90 days late, or were held by another party or were subject to a claim, counterclaim, set off or chargeback, or otherwise subject to dispute. Under this definition, "retainage" amounts were ineligible because they were retained by a third party and were due, only conditionally, after AMG's satisfactory completion of the work. So long as a municipality held retainage, the amount was due only conditionally and could become subject to a claim or chargeback, or otherwise become embroiled in a dispute between AMG and the municipality.

AMG was required under the Loan and Security Agreement to provide financial information to Sovereign on an ongoing basis (Article 10, p. 38 et seq. of Exhibit 1). The information AMG was to provide included quarterly and annual financial statements certified by an officer of AMG, monthly Borrowing Base

3

Certificates, an aging of accounts receivable, and a report on jobs in progress. The Borrowing Base Certificate was required under Article 10 to determine how much was available to be drawn under the revolving line of credit by deducting the unacceptable accounts from the gross amount of accounts receivable, multiplying by 80%, and deducting the amount already drawn under the line of credit. In no event could the amount of availability exceed the maximum amount available under the line of credit.

In addition, AMG was to meet certain standards for liabilities and net worth, and for coverage of its debt service. (Section 10-10, p. 42 of Exhibit 1).

The Non-Encumbrance Agreement granted by Antonio Gagliardi and Ann Gagliardi pertained to a commercial office building they owned at 331 Page Street in Stoughton, Massachusetts. Sovereign did not take a mortgage on the property, but simply required them to keep it clear of liens.[2]

### B.   Modification of the Loan Documents

On or about July 1, 2002 the Loan Documents were amended by a Modification Agreement which, among other things, extended the maturity date for the loan and increased availability under the revolving line of credit to $2,500,000. (Exhibit 7). The Loan Documents were again amended on June 30, 2003 by extending the maturity date to June 30, 2004. The second Modification Agreement (Exhibit 8) also noted that AMG had violated the terms of the Loan Documents by

---

[2] Title to the property is held by Antonio Gagliardi and Ann Gagliardi as tenants by the entirety. Because the property is a commercial office building and not their principal residence, the tenancy by the entirety form of ownership is equivalent to a joint tenancy. The tenancy by the entirety form of ownership protects property from seizure by a creditor only if it is the principal residence of the nondebtor spouse. M.G.L. c. 209, § 1.

4

failing to meet the required ratio of liabilities to net worth, and that Sovereign would forbear from exercising its rights with respect to the defaults.

    C.    **Overadvances and Other Defaults**

On February 15, 2004 AMG submitted to the bank a Borrowing Base Certificate which showed the line of credit to be overadvanced by $494,232 (Exhibit 9). The amount available to borrow, using the formula described above, was $1,946,863, but the company had already borrowed $2,441,096, or, in other words, had drawn $494,232 more under the line of credit than it was entitled to draw. The overadvance occurred because the amount of acceptable accounts receivables reported on the certificate had shrunk dramatically from what the company had previously reported. The Loan and Security Agreement required AMG to pay Sovereign whatever amount was necessary so that the revolving credit balance did not exceed availability. (Section 2-6 of Exhibit 1). When the first overadvance was reported, AMG did nothing to pay down the overadvance, and this failure put AMG in default of its payment obligations.

In March 2004, the bank transferred AMG's account from the regular lending group which had had responsibility for the loan since inception to the managed asset division. The bank also downgraded the credit rating on the loan. On March 22, 2004, bank representatives met with Anthony Gagliardi, president of AMG, and Robert Brodsky, the company's CPA. The loan officer introduced AMG's representatives to Bret Bokelkamp, the officer from the managed asset division who had assumed responsibility for the account. The parties discussed the overadvance problem and the prospects for AMG curing the defaults. Anthony

Gagliardi and Mr. Brodsky stated that they anticipated a net loss for the company for the year ending December, 2003. They also stated that AMG's bonding, required for public jobs, was in jeopardy.

AMG's accounts receivable aging dated February 28, 2004, showed that eligible accounts receivable had shrunk, and the amount of the overadvance under the line of credit had increased (Exhibit 10). AMG was again in default of its payment obligations.

On June 9, 2004, AMG submitted three Borrowing Base Certificates dated April 15, May 15, and June 9, 2004, all showing overadvances. (Exhibits 11, 12, 13). Each represented another payment default.

Starting in June 2004, the bank undertook discussions with AMG, Anthony Gagliardi, and Attorney Edward Quinlan about the multiple defaults and the prospects of repayment. AMG was illiquid and undercapitalized, was in serious default of its payment obligations, and was not creditworthy.

AMG and the guarantor proposed a forbearance period during which the bank would refrain from exercising its rights and remedies under the Loan Documents and allow AMG time to put together a plan of repayment. They also proposed giving the bank additional collateral so that the bank would feel more comfortable about its prospects of repayment, as it waited to see what progress, if any, AMG was able to make toward profitability, repayment of the loan, and obtaining continued bonding. Specifically, Mr. Quinlan proposed that the bank accept a mortgage on two commercial properties, 615 Concord Street in Framingham, which was owned by a realty trust, and 331 Page Street in Stoughton,

6

jointly owned by Antonio and Ann Gagliardi which they had already agreed to keep free and clear of liens by way of the Non-Encumbrance Agreement (Exhibit 6).

Further discussion ensued about the additional collateral. It was agreed that the bank would take mortgages on the 2 properties, and that additional guaranties would be executed by Anthony Gagliardi, as Trustee of the Anthony & Company Realty Trust (owner of 615 Concord Street) and Ann Gagliardi (co-owner of 331 Page Street).[3] There were numerous meetings, phone conversations and emails between Attorney Edward Quinlan on behalf of AMG and the Gagliardis and the bank's lawyers about the documentation. The lawyers circulated drafts of the mortgages and guaranties for comment and revision. Mr. Quinlan never stated that he did not represent Ann Gagliardi, and never suggested that she should not be asked to sign a limited recourse guaranty. Indeed, on more than one occasion, Mr. Quinlan made specific suggestions on the draft guaranty she was to sign, never questioning whether the guaranty was necessary in the first place and never suggesting that he did not represent her. (Exhibit 14). The expectation was clear that Ann Gagliardi would sign a Limited Recourse Guaranty, limiting her exposure to her interest in 331 Page Street. In other words, any assets other than her interest in that one piece of real estate would not be collateral for her guaranty.

---

[3] Antonio Gagliardi, the other co-owner of 331 Page Street, had already executed an Unlimited Guaranty at the inception of the loan (Exhibit 4), and he only needed to sign the mortgage covering 331 Page Street in order to post his interest in the property as additional collateral for the guaranty.

### D. The Forbearance Agreement

On July 16, 2004 the parties entered into a forbearance arrangement. There was a closing attended by Anthony Gagliardi, Ann Gagliardi, Antonio Gagliardi, Edward Quinlan, Bret Bokelkamp from Sovereign and the bank's attorney from Reimer & Braunstein. As part of the forbearance, the parties agreed:

- the bank would forbear, until December 30, 2004[4], from exercising the rights and remedies under the Loan Documents that had been triggered by the multiple defaults of AMG, and in exchange AMG would make payments under two restructured promissory notes and other liabilities, provide supplemental financial reporting, obtain additional funding, work with a financial consultant to prepare a business plan and implement appropriate controls for a financial turnaround of AMG (Exhibit 15);[5]

- AMG would repay the two restructured notes, for $1,600,000 and $1,005,264 (Exhibit 16, 17);

- the original guarantors, Antonio Gagliardi and Anthony Gagliardi, ratified their guaranties (Exhibit 18, 19);

- Anthony Gagliardi, as trustee of a realty trust, granted a mortgage on 615 Concord Street, executed an assignment of leases and rents, and also signed

---

[4] The forbearance period could have been extended to June 30, 2005 if AMG met certain benchmarks, but it did not.

[5] The forbearance agreement was a "standard workout arrangement" between a bank and a debtor, as described in *Bolduc v. Beal Bank, SSB*, 167 F. 3d 667, (1st Cir. 1999), the features of which include extending overdue loans and granting other accommodations, in exchange for new collateral.

a limited recourse guaranty in order to provide additional collateral to the bank (Exhibit 20, 21, 22).[6]

- Antonio Gagliardi and Ann Gagliardi granted a mortgage on 331 Page Street, property which they owned jointly, executed an assignment of leases and rents, and Ann Gagliardi signed a limited recourse guaranty (Exhibit 23, 24, 25).

The form of Limited Recourse Guaranty signed by both Ann Gagliardi and Anthony Gagliardi, as trustee, contained the following language:

> THE RIGHTS OF THE LENDER HEREUNDER ARE LIMITED TO THE VALUE OF THE INTEREST OF THE UNDERSIGNED IN SUCH REAL ESTATE WHICH HAS BEEN OR WHICH IS HEREAFTER GRANTED TO THE LENDER (OR HELD BY THE LENDER) WITH NO FURTHER RECOURSE AVAILABLE TO THE LENDER HEREUNDER AGAINST THE UNDERSIGNED. (See Exhibits 21 and 24).

### E.  Events after the Forbearance Agreement

On or about August 12, 2004, it came to the bank's attention that a local newspaper had reported that AMG had been fired from a school construction job for the town of Avon because of poor performance and failure to adhere to the construction schedule. (Exhibit 26). It was possible, according to the report, that AMG's bonding company would take over the construction. AMG did not volunteer this information to the bank, or give any advance notice that the press would carry negative reports. The Avon job had represented $357,440 in current accounts receivable, and $410,094 in retainage, according to AMG's aging report

---

[6] Anthony Gagliardi's original guaranty, which he reaffirmed, was executed in his individual name. Because the property at 615 Concord Street was owned by Anthony Gagliardi as trustee of Anthony & Company Realty Trust, Mr. Gagliardi, in his capacity as trustee, executed a new Limited Recourse Guaranty in order to complete the mortgage transaction. In the same way, Ann Gagliardi signed a new Limited Recourse Guaranty in order to complete the mortgage transaction with respect to 331 Page Street.

dated February 28, 2004 (Exhibit 10). Without those receivables being considered current and acceptable under the borrowing formula, AMG would be even more overadvanced than previously.

In September, 2004, after the bank initiated contact, Anthony Gagliardi represented to the bank that AMG had worked out a solution with Avon, and that it was being kept on the job. He also promised to provide a revised business plan, albeit late, as it had been due August 15 according to the Forbearance Agreement.

On or about October 21, 2004, AMG and its accountant and financial advisor met with the bank's representative. The CPA admitted that the company's first quarter results had been changed for the worse and would have to be restated, and that the bank had not been informed of the change.

Two weeks later, on or about November 2, 2004, the local press again reported that the town of Avon was dissatisfied with AMG because of missed deadlines, and the AMG might be fired from the job. (Exhibit 7). Five days later, on November 7, 2004, it was reported that AMG was, in fact, fired from the job. (Exhibit 8). The bonding company would step in and have the work completed, thus further jeopardizing payment of the receivables due under the contract. Again, AMG did not come forward with this information to the bank, but let the bank read about it in the newspaper. The loss of the job, the bonding company's assumption of responsibility for completing the job, and AMG's failure to communicate all constituted events of default. In addition, AMG's business consultant informed the bank that AMG had not obtained bonding. Inability to obtain bonding would constitute another event of default.

On December 1 and December 6, 2004, Bret Bokelkamp from the bank tried to reach Anthony Gagliardi and left several messages. The calls were not returned. On December 13, 2004, the bank's attorneys sent demand letters to AMG and the guarantors. There was no response from any of them. On December 30, 2004, the forbearance period expired. On January 10, 2005, the Bret Bokelkamp called Anthony Gagliardi. Again he did not respond.

On January 18, 2005, the bank commenced suit in Suffolk Superior Court against AMG, Antonio Gagliardi and Anthony Gagliardi, Civil Action No. 2005-00190. The bank also commenced foreclosure proceedings with respect to 331 Page Street and 615 Concord Street. A judgment of foreclosure was issued on March 29, 2005, with respect to 331 Page Street in Stoughton. A judgment of foreclosure was issued on May 24, 2005, with respect to 615 Concord Street in Framingham.

On January 19, 2005, counsel for Ann Gagliardi sent a demand letter to the bank alleging, *inter alia*, violations of the Equal Credit Opportunity Act ("ECOA").

On March 31, 2005, Ann Gagliardi, through counsel, filed a complaint in Superior Court against the bank alleging violations of the ECOA. The case was removed to this Court on April 28, 2005.

Now pending before the Court is Ann Gagliardi's Motion for Preliminary Injunction to enjoin the foreclosure auction of the property located at 331 Page Street. Her claim, which Sovereign argues has no legal merit, is that Sovereign violated the ECOA when she executed a limited recourse guaranty in connection with the mortgage on the 331 Page Street property.

11

## II. ARGUMENT

### A. Plaintiff can not show that she is likely to prevail on the merits.

The four factors to be balanced in deciding a motion for preliminary injunction are: (1) irreparable injury to the plaintiff; (2) balancing of harms to the defendant; (3) likelihood of success on the merits; and (4) the public interest, if any. *See Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003). Under this test, plaintiff's case will fail on multiple grounds.

#### 1. Plaintiff will not be irreparably injured by the foreclosure.

First, the ECOA and Regulation B provide that if a violation occurred, the creditor is subject to civil liability for actual and punitive damages, with the latter limited to $10,000. 15 U.S.C. § 1691e (b); 202 CFR § 202.17 (b). The bank's foreclosure on the Stoughton property does not in any way diminish plaintiff's ability to recover damages, if it is ultimately determined that a violation occurred. The foreclosure will have no impact on plaintiff's rights under the ECOA, and she will not suffer irreparable harm of any cognizable right under the statute. Without a showing of irreparable injury, which is the *sine qua non* for granting equitable relief, no injunction can issue.

#### 2. The balance of hardships will be on Sovereign, if an injunction is granted.

Second, even if the Court finds that the limited recourse guaranty constitutes an ECOA violation, no injunction barring the foreclosure is justified. An injunction of the foreclosure would be tantamount to this Court voiding both the guaranty *and* the mortgage, because the result would be that Sovereign will not be able to realize

on its collateral. Punishing Sovereign by stripping the bank of its rights to the collateral is the sort of broad based punitive remedy that courts have found was not intended by Congress. *Integra Bank/Pittsburgh v. Freeman*, 839 F. Supp. 326 (E.D. Pa. 1993). Congress intended to give injured plaintiffs the right to recover damages where there is an ECOA violation, but not to void creditors' security documents. Enjoining Sovereign from foreclosing on its collateral would be tantamount to voiding its guaranty and mortgage, and the hardship resulting from the injunction would fall on the bank. Where the hardship falls exclusively on the party sought to be enjoined, no injunction should issue.

        3.        **Plaintiff is not likely to succeed on the merits.**

Third, plaintiff can not succeed on the merits, and therefore no preliminary injunction should enter in her favor. Plaintiff complains that her execution of the limited recourse guaranty, as part of granting a mortgage on jointly owned property, was a violation of the ECOA. This argument can not stand in the face of cases interpreting the statute and the related Regulation B, or in the face of Massachusetts law.

ECOA, at 15 U.S.C. § 1691 (a) (1), makes it "unlawful for any creditor to discriminate against an applicant with respect to any aspect of a credit transaction – (1) on the basis of . . . marital status. . . . Regulation B, promulgated by the Board of Governors of the Federal Reserve System and contained in 12 CFR § 202.7 (d), provides in relevant part that "a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of

creditworthiness for the amount and terms of the credit requested (emphasis added)." As indicated by the emphasized words, the regulation applies only when the spouse is not a joint applicant, or when the applicant is creditworthy. In this case, Ann Gagliardi was a joint applicant, and neither the borrower nor the other guarantors were creditworthy, and thus no violation occurred.

First, Ann Gagliardi was a "joint applicant" within the meaning of Regulation B. Antonio and Ann Gagliardi jointly owned the property at 331 Page Street in Stoughton. At the inception of the loan, Antonio had executed an unlimited guaranty, and he and his wife agreed to keep the property free of liens. During the parties' negotiation of the forbearance, it was agreed that the jointly owned property would become collateral. Ann's status as a co-owner of the property meant that she was considered a "joint applicant" under Regulation B, along with her husband who already was an unlimited guarantor. *See Midlantic National Bank v. Hansen*, 48 F. 3d 693 (3d Cir. 1995), cited with approval by the Supreme Judicial Court *Baybank v. Bornhofft*, 427 Mass. 571, 694 N.E. 2d 854 (1998), holding that a husband's and wife's joint ownership of an asset used to collateralize a loan is sufficient to constitute a joint application by the spouses. Therefore, the regulation's prohibition on requiring the signature of a spouse who is not a joint applicant does not even come into play, because she is considered, as a legal matter, a "joint applicant."

Second, neither AMG nor Antonio was creditworthy for the amount of the loan's balance at the time Ann Gagliardi was asked to sign the limited recourse guaranty. Under Regulation B, if the co-applicant is not creditworthy, the

14

prohibition on requiring a spouse's signature does not come into play. The Bokelkamp Affidavit amply sets forth the facts illustrating the lack of creditworthiness. Ann Gagliardi will not be able to show that either AMG or Antonio was creditworthy.[7] Where a creditor determines that a borrower is not independently creditworthy, as Sovereign did in this case as early as March 2004, it may request a spouse to guaranty the loan. *Riggs National Bank v. Linch*, 36 F. 3d 370 (4th Cir. 1994). In sum, Regulation B does not apply where, as here, the plaintiff has not and can not met its burden of proving that the applicant was creditworthy.

Moreover, Massachusetts law is clear that requiring a spouse's signature for the purpose of creating a lien is not a violation of the ECOA. Requiring the signature of both spouses for the sole purpose of creating a valid lien does not constitute discrimination under the ECOA. *Kaitz v. Shane*, 1995 Mass. Super. Lexis 525 (1995). Also, *Safety Fund National Bank v. Plante*, 1995 Mass. Super. Lexis 421 (1995), addressed facts similar to those presented here: the loan was in default, foreclosure proceedings were underway, and the bank agreed to forbear from continued foreclosure subject to certain conditions, including the condition that one of the borrower's parents execute limited guaranties. The court there found that defendants could not argue that the borrowers were creditworthy. Therefore, obtaining a signature on a guaranty to support the defaulted loan was not a violation of either the ECOA or Regulation B.

---

[7] The burden of proving that the borrower was creditworthy rests on the plaintiff. The bank has no burden to allege or prove an affirmative defense that the borrower was not creditworthy. *Ramsdell v. Bowles*, 64 F. 3d 5 (1st Cir. 1995).

Also in *Safety Fund National Bank v. Plante, supra,* the court noted that the guarantors were represented by counsel in connection with their execution of the guaranties. Similarly, the Gagliardis were represented by Edward Quinlan during the negotiations for the forbearance, and at the closing of the forbearance agreement. Ann Gagliardi may argue that Mr. Quinlan did not represent her, but the facts show otherwise. He negotiated the language of the limited recourse guaranty she was to sign, emailed his comments to the bank's lawyers, and attended the closing with her. (See ¶¶ 28-33 of the Bokelkamp Affidavit and Exhibit 14).

Even if this Court disagrees that Ann was a joint applicant, or even if the Court finds that she had met the burden of proving that AMG and Antonio were creditworthy, the bank is nonetheless exempt from liability because it believed, in good faith, that taking a joint owner's signature on a limited recourse guaranty and mortgage was necessary to obtain a lien on the jointly held property. (See ¶ 30 of the Bokelkamp Affidavit). A creditor is protected from liability for any act done in good faith to comply with state law. *See* 12 CFR § 202, Supplement I to Part 202, § 202.7-Rules Concerning Extensions of Credit. As provided in § 202.7 of the regulation, a creditor may have the joint owner of property sign an instrument that insures access to the property, such as a limited recourse guaranty. A creditor's reasonable belief as to what instrument is needed under state law should be supplemented by a thorough review of the law. As discussed above, a review of Massachusetts law revealed the cases of *Kaitz v. Shane,* 1995 Mass. Super. Lexis 525 (1995) and *Safety Fund National Bank v. Plante,* 1995 Mass. Super. Lexis 421

(1995), both holding that taking a limited recourse guaranty in connection with collateral is required and standard practice in Massachusetts.

Finally, even if this Court were to disagree with existing federal and state law, and find that Ann Gagliardi's signature on the mortgage alone would have been sufficient to provide the bank with the additional collateral it needed to support the defaulted loan, the limited recourse guaranty gives Sovereign nothing more than the rights it would have under the mortgage, if the mortgage alone had been sufficient to secure the collateral for the bank. Under the terms of the guaranty, the bank can exercise its rights only against Ann's interest in the 331 Page Street property. The bank can not reach her other assets because of the limiting language contained in the guaranty:

> THE RIGHTS OF THE LENDER HEREUNDER ARE LIMITED TO THE VALUE OF THE INTEREST OF THE UNDERSIGNED IN SUCH REAL ESTATE WHICH HAS BEEN OR WHICH IS HEREAFTER GRANTED TO THE LENDER (OR HELD BY THE LENDER) WITH NO FURTHER RECOURSE AVAILABLE TO THE LENDER HEREUNDER AGAINST THE UNDERSIGNED. (Exhibit 25)

In other words, even if taking the guaranty was unnecessary, the plaintiff is not disadvantaged by the guaranty – her interest in the property is subject to Sovereign's mortgage rights, whether or not she signed the guaranty, because she indisputably granted a mortgage on her interest in the property.

For all the reasons discussed above, plaintiff will not succeed on the merits, and is not entitled to a preliminary injunction.

4.     **No public interest is affected by this case.**

The transaction at issue is entirely private, between a bank, a borrower and guarantors. No public interest is affected. On this element, plaintiff will not succeed, and no injunction should issue.

B.     **Conclusion**

Because plaintiff is not likely to succeed on the merits, because enjoining the foreclosure will injure Sovereign's right to realize on its collateral, and because plaintiff will not suffer any injury to her ability to remedy her rights under the ECOA, even if there has been any such violation, this Court should deny plaintiff's motion for preliminary injunction.

DEFENDANT
SOVEREIGN BANK
by its attorney,

*/s/ Kathleen C. Stone*
Kathleen C. Stone
BBO# 481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050

July 7, 2005

## CERTIFICATE OF SERVICE

I certify that on the 7th day of July 2005 I caused to be mailed a copy of the foregoing, first class, postage prepaid, to:

Michael C. McLaughlin, Esq.
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, MA  02108

*Kathleen C. Stone*
Kathleen C. Stone

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.