UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANN GAGLIARDI
      Plaintiff

    v.

Civil Action No.
05-10859-NG

SOVEREIGN BANK
      Defendant

## **AFFIDAVIT OF BRET E. BOKELKAMP**
## **IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

I, Bret E. Bokelkamp, being duly sworn, hereby state:

1. I am employed as a vice president by Sovereign Bank (referred to herein as "Sovereign" or "the bank").

2. I work in the managed assets division of Sovereign. As part of my job I have responsibility for loan accounts that are in default or otherwise lack creditworthiness.

3. I make this affidavit based on my personal knowledge, and based on my review of the bank's books and records.

4. Starting in or about March 2004 I assumed responsibility for the loan to AMG Construction Company, Inc. ("AMG").

5. The loan to AMG was originally made on or about July 30, 2001 and was evidenced by the following documents (collectively referred to as the "Loan Documents"):

   - a Loan and Security Agreement executed by AMG and Sovereign (Exhibit 1);

- a Revolving Credit Note executed by AMG in the amount of $2,000,000 (Exhibit 2);

- an Equipment Line Note executed by AMG in the amount of $200,000 (Exhibit 3);

- an Unlimited Guaranty executed by Antonio Gagliardi (Exhibit 4);

- an Unlimited Guaranty executed by Anthony Gagliardi (Exhibit 5);

- and a Non-Encumbrance Agreement executed by Ann Gagliardi and Antonio Gagliardi (Exhibit 6).

6. The loan arrangement between AMG and Sovereign was a revolving line of credit, as described in Exhibit 1 (see, in particular, Article 2, starting on p. 15 of Exhibit 1). A fair summary of the arrangement was that AMG was entitled to borrow against the line of credit an amount equal to the *lesser* of (i) the principal amount of the Note, or (ii) 80% of the acceptable accounts receivable.

7. Only certain of AMG's accounts receivable were eligible to be considered in the calculation of the amount that could be borrowed. "Acceptable Accounts" was a term defined in the Loan and Security Agreement (see Article 1, p. 1 of Exhibit 1) as those not unpaid more than 90 days past the invoice date. Accounts that were not acceptable included those that were more than 90 days late, or were held by another party or were subject to a claim, counterclaim, set off or chargeback, or otherwise subject to dispute.

8. "Retainage" is a common term under construction contracts. Some of the amount due under a construction contract typically is held back, or retained, by the hiring party, until the work is completed in accordance with time and performance

2

standards. Under the definition of Acceptable Accounts in Exhibit 1, "retainage" amounts were ineligible for purposes of calculating the amount available to borrow because they were held by a third party and were due, only conditionally, after AMG's satisfactory completion of the work.

9.  AMG was required under the Loan and Security Agreement to provide financial information to Sovereign on an ongoing basis (see Article 10, starting on p. 38 of Exhibit 1). The information AMG was to provide included quarterly and annual financial statements certified by an officer of AMG, monthly Borrowing Base Certificates, an aging of accounts receivable, and a report on jobs in progress.

10. The Borrowing Base Certificate was required under Article 10 to determine how much was available to be drawn under the revolving line of credit by deducting the unacceptable accounts from the gross amount of accounts receivable and multiplying by 80%. In no event could the amount of availability exceed the maximum amount of the note.

11. In the event AMG drew more under the line of credit than was available under the borrowing formula, AMG was required, under Section 2.6 of the Loan and Security Agreement, to pay Sovereign the amount by which the outstanding balance exceeded availability.

12. In addition, AMG was to meet certain standards for the relationship between its liabilities and net worth, and for coverage of its debt service (Section 10-10, p. 42 of Exhibit 1).

13. The Non-Encumbrance Agreement granted by Antonio Gagliardi and Ann
    Gagliardi pertained to a commercial office building they owned at 331 Page Street
    in Stoughton, Massachusetts.

14. On or about July 1, 2002 the Loan Documents were amended by a Modification
    Agreement. Among other things, the Modification Agreement extended the
    maturity date for the loan and increased availability under the revolving line of
    credit to $2,500,000. Also, AMG ratified the terms and conditions of the Loan
    Documents. (Exhibit 7).

15. The Loan Documents were again amended on June 30, 2003 by extending the
    maturity date to June 30, 2004. The second Modification Agreement also stated
    that AMG had violated the terms of the Loan Documents by failing to meet the
    required ratio of liabilities to net worth, and that Sovereign agreed to forbear from
    exercising its rights with respect to the defaults. AMG ratified the terms and
    conditions of the Loan Documents. (Exhibit 8).

16. On or about February 15, 2004 AMG submitted to the bank a Borrowing Base
    Certificate, together with an accounts receivable aging dated January 31, 2004,
    which showed the line of credit to be overadvanced by $494,232 (Exhibit 9). The
    amount available to borrow was $1,946,863, but the company had already
    borrowed $2,441,096, or, in other words, had drawn $494,232 more under the line
    of credit than it was entitled to draw.

17. The overadvance occurred because the amount of acceptable accounts receivable
    reported on the certificate was lower than what the company had previously
    reported.

4

18. When the overadvance was reported on the February 15, 2004 Borrowing Base Certificate, AMG did nothing to pay down the overadvance, and this failure put AMG in default of its payment obligations.

19. In or about March 2004 the bank downgraded the AMG loan because of the payment default. The bank transferred AMG's account from the regular lending group which had had responsibility for the loan since inception to the managed asset division, and I assumed responsibility for the loan.

20. On or about March 22, 2004 I met with Anthony Gagliardi, president of AMG, and Robert Brodsky, the company's CPA. Ken Nasif of Sovereign's lending group, who already had a relationship with AMG and the Gagliardis, also attended the meeting. I was introduced as the officer who had assumed responsibility for the account.

21. At our meeting we discussed the overadvance problem and the prospects for AMG curing the defaults. Anthony Gagliardi and Mr. Brodsky stated that they anticipated a net loss for the company for the year ending December 2003. They also stated that AMG's bonding was in jeopardy for future public jobs. Public contracts formed the vast majority of AMG's work, and bonding was required to bid on public jobs. Inability to maintain bonding would mean that AMG could not continue in its principal line of business.

22. On or about March 25, 2004, AMG provided the bank with an accounts receivable aging dated February 28, 2004 which showed that eligible accounts receivable had shrunk to approximately $879,000, and the amount of the

5

overadvance had increased. (Exhibit 10). Again, AMG was in default of its
payment obligations because of the overadvance.

23. On or about April 29, 2004, Anthony Gagliardi left the country for a two week
    vacation. He left me a phone message, after the close of business, stating that he
    was going away. He had not provided the Borrowing Base Certificate that was
    due April 20, 2004, or any updated information on AMG's profit/loss projections
    or any assurances as to how the bank might be repaid. I tried to reach Mr.
    Gagliardi at his office, on his cell phone, and at his home, but to no avail.

24. On or about June 9, 2004 AMG submitted a Borrowing Base Certificate dated
    April 15, 2004 together with an accounts receivable aging dated March 31, 2004.
    The certificate showed another significant overadvance of $1,562,456 (Exhibit
    11). This represented a continuing and growing payment default.

25. The Borrowing Base Certificate dated May 15, 2004, also submitted to the bank
    on June 9, 2004, showed an overadvance of $1,966,565 (Exhibit 12). The
    company remained in payment default, and the size of the overadvance was
    growing.

26. The Borrowing Base Certificate dated June 9, 2004, submitted that day, showed
    an overadvance of $1,949,029 (Exhibit 13), and the company remained in
    payment default.

27. Starting in or about June 2004 I undertook discussions with AMG, Anthony
    Gagliardi, and attorney Edward Quinlan about AMG's multiple payment defaults
    and the prospects of repayment. At that time, AMG was illiquid and
    undercapitalized as a result of its recent and continuing operating losses, was in

6

serious default of its payment obligations to Sovereign, and it was not a creditworthy entity.

28. In or about June 2004 AMG and the guarantors suggested a forbearance agreement, based on terms Mr. Quinlan had proposed, according to which the bank would refrain from exercising its rights and remedies under the Loan Documents and allow AMG time to put together a plan of repayment. They also proposed giving the bank additional collateral so that the bank would feel more comfortable about its prospects of repayment, as it waited to see what progress, if any, AMG was able to make toward profitability, repayment of the loan and obtaining continued bonding. Specifically, he proposed that the bank accept a mortgage on two commercial properties, 615 Concord Street in Framingham, owned by a realty trust, and 331 Page Street in Stoughton, the property jointly owned by Antonio and Ann Gagliardi which they had already agreed to keep free and clear of liens by way of the Non-Encumbrance Agreement.

29. In connection with discussions about a forbearance agreement, Antonio Gagliardi and Anthony Gagliardi, both of whom were unlimited guarantors of AMG's loan, submitted financial statements to the bank. According to their statements, their significant assets to include their residences, a parcel of land in Gloucester, the property at 331 Page Street in Stoughton (jointly owned by Antonio and Ann Gagliardi), and the property at 615 Concord Street in Framingham (owned by Anthony & Company Realty Trust, a realty trust of which Anthony Gagliardi was the sole beneficiary).[1]

---

[1] The personal financial statements are available for review, but have not been submitted as part of this Affidavit.

30. Further discussion ensued about additional collateral. It was agreed that the bank would take mortgages on 2 pieces of property, and that in connection with the mortgages Anthony Gagliardi, in his capacity as Trustee of the Anthony & Company Realty Trust (owner of 615 Concord Street) and Ann Gagliardi (co-owner of 331 Page Street) would execute limited recourse guaranties. This course of action conformed to my prior experience as a bank officer as to how a bank takes a mortgage on property owned by a party who is not fully liable for the debt, either as borrower or unlimited guarantor, and conformed to the advice given by the bank's counsel at Reimer & Braunstein.

31. There were numerous meetings, phone conversations and emails between the bank's lawyers and Attorney Edward Quinlan on behalf of AMG and the Gagliardis about the wording of the various forbearance documents.

32. The lawyers circulated drafts of the mortgages and guaranties for comment and revision. Mr. Quinlan, on more than one occasion, commented on the draft guaranty to be signed by Ann Gagliardi. At no point, to my knowledge, did he question whether a guaranty was necessary; he simply commented on the language proposed by the bank's lawyers (Various emails to and from Mr. Quinlan and Anthony Gagliardi on this subject are attached as Exhibit 14).

33. On July 16, 2004 I attended a closing of the forbearance agreement. The bank was represented by Mark Scott, an attorney with Reimer & Braunstein. Also in attendance at the closing were Anthony Gagliardi, Ann Gagliardi, Antonio Gagliardi and their lawyer Edward Quinlan.

8

34. In summary, the forbearance agreement extended the time for AMG's

performance; restructured the debt into two notes; conditionally forgave interest,

if AMG paid one of the notes by December 31, 2004; required AMG to provide

supplemental financial reporting, including a business plan by August 15, 2004,

prepared with the assistance of a financial consultant, showing the company's

plan for the orderly repayment of the debt; required AMG to have bonding that

would allow it to bid on public projects; required additional collateral for the debt;

and required an infusion of additional capital into AMG.

35. The forbearance agreement was evidenced by the following documents:

- Forbearance Agreement (Exhibit 15);

- Two restructured notes, for $1,600,000 and $1,005,264 (Exhibit 16, 17);

- Ratification of guaranties by the original guarantors, Antonio Gagliardi and
  Anthony Gagliardi (Exhibit 18, 19);

- A mortgage on 615 Concord Street, Framingham, executed by Anthony
  Gagliardi, as trustee of Anthony & Company Realty Trust, an assignment of
  leases and rents with respect to the property and a limited recourse guaranty
  also signed by Anthony Gagliardi as Trustee (Exhibit 20, 21, 22)

- A mortgage on 331 Page Street, Stoughton, executed by Antonio Gagliardi
  and Ann Gagliardi, an assignment of leases and rents with respect to the
  property and a limited recourse guaranty executed by Ann Gagliardi (Exhibit
  23, 24, 25).

36. On or about August 12, 2004 a local newspaper reported that AMG had been fired

from a school construction job for the town of Avon because of poor performance

9

and failure to adhere to the construction schedule (Exhibit 26). AMG did not

volunteer this information to me, or give any advance notice that the press would

carry negative reports, but I saw the article in the paper. This was three days

before the business plan was due, according to the Forbearance Agreement.

37. On or about September 15, 2004 I talked with Anthony Gagliardi, and he

promised me that AMG would provide a revised business plan by September 17,

2004. The plan actually had been due, under the terms of the Forbearance

Agreement, on August 15, 2004. Also, Anthony Gagliardi represented to me that

AMG had worked out a solution with Avon, and it was being kept on the job.

38. On or about September 23, 2004 the bank received appraisals of the Framingham

and Stoughton properties. The values were less than had been represented by

AMG and the guarantors in connection with the Forbearance Agreement, and this

discrepancy constituted an event of default under the Forbearance Agreement.

39. On or about October 21, 2004, I met with AMG, its accountant Mr. Brodsky, and

its financial advisor Philip Koser. In the course of my questioning, I discovered a

discrepancy between the company prepared monthly financial results for 2004,

and the accountant's review statement for the quarter ended March 31, 2004. Mr.

Brodsky answered my inquiry by stating that the first quarter results had been

changed and were to be restated, and that I had not been informed of the change.

40. Two weeks later, on or about November 2, 2004, the local press again reported

that the town of Avon was dissatisfied with AMG because of missed deadlines,

and the AMG might be fired from the job (Exhibit 27).

41. On or about November 4, 2004 I spoke to Mr. Koser. He said that AMG had not obtained bonding. He also had heard that AMG might be thrown off the Avon job, and we discussed our shared understanding that the loss of the Avon job would prevent AMG from getting bonding in the future. Inability to obtain bonding would constitute an event of default under the Forbearance Agreement.

42. Five days later, on November 7, 2004, it was reported that AMG was in fact fired from the job (Exhibit 28). The bonding company would step in and have the work completed, according to the report. Again, AMG had not come forward with this information, but instead I had read about it in the newspaper. The loss of the job, the bonding company's assumption of responsibility for completing the job, and AMG's failure to communicate with the bank, all constituted events of default.

43. Avon had owed AMG approximately $959,000 in current billings and retainage, according to account receivable agings the company had submitted to the bank. Termination from the job jeopardized payment of any of this amount, and non-payment by Avon was likely to render AMG insolvent.

44. On December 1, 2004, and again on December 6, 2004, I called Anthony Gagliardi to discuss the situation. He did not return the call.

45. On December 13, 2004 the bank's attorneys sent demand letters to AMG and the guarantors. There was no response from any of them.

46. On December 30, 2004, the forbearance period expired.

47. On January 10, 2005 I called Anthony Gagliardi again. He did not respond.

48. On January 18, 2005 the bank commenced suit in Suffolk Superior Court against AMG, Antonio Gagliardi and Anthony Gagliardi, Civil Action No. 2005-00190.

49. The bank also commenced foreclosure proceedings with respect to 331 Page Street and 615 Concord Street. A judgment of foreclosure was issued on March 29, 2005 with respect to 331 Page Street in Stoughton. A judgment of foreclosure was issued May 24, 2005 with respect to 615 Concord Street in Framingham.

Signed under the pains and penalties of perjury this 6th day of July 2005.

Bret E. Bokelkamp

## CERTIFICATE OF SERVICE

I certify that on the 7th day of July 2005 I caused to be mailed a copy of the foregoing, first class, postage prepaid, to:

Michael C. McLaughlin, Esq.
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, MA  02108

Kathleen C. Stone