UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10859-NG

| | |
|---|---|
| MRS. ANN GAGLIARDI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SOVEREIGN BANK, | ) |
| | ) |
| Defendant. | ) |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFF MRS. ANN GAGLIARDI'S MOTION FOR PRELIMINARY INJUNCTION BASED UPON THE PLAINTIFF'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction

Now comes the Plaintiff with this Supplemental Memorandum in Support of the Plaintiff Mrs. Ann Gagliardi's Motion for Preliminary Injunction Based Upon Plaintiff's First Amended Complaint and Demand for Jury Trial, and the Courts inquiry into the applicability of the Equal Credit Opportunity Act (ECOA) to the Plaintiff's Motion for Preliminary Injunction.

### THE PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS UNDER ECOA

Congress enacted ECOA in 1974 "to provide a consumer weapon against discrimination on the basis of … marital status [among other things] in the extension of credit…" FDIC v. Allen, 1988 U.S. Dist. LEXIS 17565 (W.D. Okla. 1988). To carry out

1

this statutory purpose, ECOA and its implementing regulations, 12 C.F.R. §202.1 et seq.,
"prohibit a creditor from requiring a spouse's signature on a note [or any credit
instrument including a guaranty], even if the property pledged to secure the loan is jointly
owned." *Anderson v. United Finance Co.*, (9th Circuit 1992) 666 F.2d at 1274, 1277. To
require a married credit applicant who qualifies for credit individually to procure his
spouse's signature on a credit instrument constitutes discrimination on the basis of
marital status within the meaning of ECOA. Id., 666 F.2d at 1277.

## THE CREDITWORTHINESS OF THE APPLICANT

In order for the Court to evaluate the likelihood of success of the Plaintiff, the
Court must consider whether Sovereign undertook a creditworthiness analysis of the
applicant for credit, AMG. The difficulty with the examination of this question is that
Sovereign undertook parallel courses of action which confuse and obfuscate the issue.
On one hand, the record seems clear, based upon the Bokelkamp Affidavit, that AMG
was not creditworthy. See paragraph 27 of the Bokelkamp Affidavit. Ordinarily, this
would appear to be sufficient to conclude that Sovereign could look elsewhere for the
additional collateral and guarantees. However, an examination of the Forbearance
Agreement makes clear that a creditworthiness analysis was not done prior to signing of
the Plaintiff's Guaranty on July 16, 2004.

The Forbearance Agreement reveals that the extension of credit represented by
the execution of $2.6 million in notes on July 16, 2004 was undertaken without Sovereign
evaluating any business plan by AMG. In fact, AMG was not required to submit a
business plan until August 15, 2004, 30 days after the notes and the Guaranty were
signed. This requirement to submit a business plan after the notes were signed can be

2

found in the Forbearance Agreement on page 12, section 8c. This section states "the Borrower shall deliver to Lender ... by no later than August 15, 2004 a business plan (the "Business Plan"), prepared with the assistance of and reviewed by the Financial Consultant, setting forth the Borrower's plan for the orderly repayment of the full amount of the Liabilities." The above quote indicates that Sovereign, at the time the $2.6 million notes were executed, did not know how AMG planned for the orderly repayment of those notes on December 31, 2004. Since no business plan then existed, Sovereign also knew that AMG did not know how it planned to repay the notes.

A second critical component of determining whether AMG was creditworthy would have to be whether AMG could obtain bonding commitments for the construction jobs it was already involved in. Obviously, executing $2.6 million of notes would require understanding whether AMG could continue in the construction business. Without bonding, AMG was virtually certain to fail. Although it is hard to believe, Sovereign had no idea whether AMG could obtain such bonding and yet it extended the credit to AMG on July 16, 2004. Section 9 of the Forbearance Agreement states as follows:

**"Bonding**
The Borrower shall have obtained bonding commitments from a bonding and/or surety company ("**Bonding Company**") registered in the Commonwealth of Massachusetts, which would enable the Borrower to bid upon public projects in the minimum amount of $5,000,000.00 by no later than September 15, 2004."

The fact is that the above quote can only be read to mean that Sovereign did not care whether bonding was in place at the time of the alleged extension of credit. This seems, from a banking point of view, absurd. In fact, Sovereign allegedly extended the credit to AMG and did not even require proof of bonding until 62 days later (September 15, 2004).

3

This would suggest, particularly in the absence of the business plan, that the extension of any credit was unrelated to any creditworthiness analysis.

A third component relating to the creditworthiness of AMG can be found at section 11 of the Forbearance Agreement on page 14. This section entitled "Conditions Relating to the Additional Collateral" clearly indicates that the additional collateral represented by Mrs. Gagliardi's property was never appraised by Sovereign prior to the extension of the credit on July 16, 2004. In fact, under 11b, the appraisal of the properties did not have to be submitted until 60 days after the extension of credit on July 16, 2004. The Plaintiff respectfully suggests that the Court will be hard press to identify any banking procedure for the extension of credit which allows for the extension prior to understanding of a) what the business plan was for the repayment, b) whether the company could obtain a bond in order to operate, and c) what the value of collateral was.

Logics suggest that no bank would execute the Forbearance Agreement and enter into new notes with AMG unless AMG as of July 16, 2004, was creditworthy for that extension of credit. Sovereign can not have it both ways. It can not state on one hand that AMG, was not creditworthy and on the other hand execute documents which demonstrate that AMG had to be creditworthy at the time the documents were executed or that creditworthiness was never a consideration. In affect, Sovereign, by executing the Forbearance Agreement stated "we will extend the credit even though we do not know a) if you can ever can pay the money back, b) whether you can continue business, c) even though we do not know what the value of the collateral is." There is no other way to read the Forbearance Agreement, other than to say that Sovereign must have not undertaken a creditworthiness analysis.

4

## THE ECOA CLAIM AND ITS RELATION TO THE PLAINTIFF'S SPOUSE

The Court (if not already confused by Sovereign's illogical behavior), must now consider whether Sovereign determined that the Plaintiff's spouse, Antonio Gagliardi was or was not creditworthy. This presumes that Antonio Gagliardi was an "applicant" for credit. The fact is, however, that the applicant was AMG. Antonio Gagliardi was a guarantor of the original 2001 debt. He was also required, on July 16, 2004 in the Forbearance Agreement to guarantee the new notes. He never applied for the new loans. Indeed, the Forbearance Agreement itself demonstrates that he never applied at all. This can by found in section 13a of the Forbearance Agreement in which he was required to submit an application no later that July 15, 2004. No application was ever submitted. Notwithstanding, this fact, Sovereign asserted that the Antonio applied for the extension of credit. See the Bokelkamp Affidavit para. 29. Since Sovereign asserts that Antonio was an applicant then the Court may elect to consider, assuming *arguendo*, that he was applicant, whether Sovereign ever consider his creditworthiness before requiring a signature of his wife on a Guaranty.

Just as the AMG analysis above indicates, Sovereign allegedly extended credit without caring to know the business plan, the bonding and the appraisals issues. So also does that analysis apply to the creditworthiness of Antonio Gagliardi. The Court must remember that the loan was closed on July 16, 2004 without the bank knowing the value of the real estate. Therefore, the Court must conclude that Sovereign closed the loan based upon AMG's and Antonio Gagliardi's financial strength without the real estate. The bank can not claim that the real estate was a critical component of Antonio's creditworthiness because the bank did not even require an appraisal of the property.

5

Sovereign, realizing the importance now of explaining who was the "applicant" under ECOA, has sought to defeat the Plaintiff's equitable defense to the Defendant's attempts to enforce the debt against her by asserting that she, was a joint applicant for the loan, and therefore that her use of ECOA is an impermissible attempt to void the underlying mortgage. It does not take special expertise in commercial lending practices to understand how very unlikely it is that someone of the Plaintiff's business naiveté and token income would take it upon herself to apply for commercial loans in the amount of $2,600,000.00. It is patently obvious that she signed the Guaranty because she was required to do by Sovereign simply because she was the wife of Antonio Gagliardi.

## ECOA REGULATION B – 15 USCS APPEX.12 CFR SECTION 207.7

Section 202.7(d)(1) prohibits a lender from requiring the spouses of a creditworthy applicants from also signing the loan documents unless the spouses are "joint applicants" for the loan. The Court must consider whether the Plaintiff is a "joint applicant". The Supreme Judicial Court, in Baybank v. Bornhofft, 427 Mass 571 (1998), recently analyzed the issue of when a signatory to loan documents should be deemed a "joint applicant" for purposes of ECOA regulation, 12 C.F.R. Section 202.7(d)(1). In Baybank, the Court reviewed the Official Staff Interpretations to Section 202.7(d)(1), at 12 C.F.R. Part 202, which defines the term "joint applicant" to mean "someone who applies contemporaneously with the applicant for shared or joined credit," but not including "someone whose signature is required by the creditor as a condition for granting the credit requested." Then, the Court looked to the dictionary and two federal cases to formulate its own rule of thumb for recognizing a "joint applicant", as follows:

> First, the act of applying must be contemporaneous, not sequential. This
> temporal requirement guards against the very situation that §202.7(d) was

6

designed to avoid – where a creditor receives an application from one person and then later requires an additional signature. Second, the application must be "for shared or joint credit." We take this to mean **that the two persons must have some common interest in the credit requested**. (emphasis supplied).

Id. at 859. The Court also looked for guidance to two federal cases in which spouses were deemed to be "joint applicants" for credit: Midlantic Nat'l Bank v. Hansen, 48 F.3d 693 (3d Cir. 1995) and Riggs Nat'l Bank v. Webster, 832 F.Supp. 147 (D.Md. 1993).

In Midlantic, the spouses took out a number of loans in order jointly to acquire a number of banks; they applied by submitting consolidated financial statements stating that they both operated their business; and all of the property pledged to secure their loans was jointly owned. 832 F.Supp. at 699-700. The Third Circuit distinguished these facts with other cases in which spouses required to sign notes "were not connected to the underlying transactions for which the loans were sought." Id. at 699, citing Marine American State Bank v. Lincoln, 433 N.W.2d 709 (Iowa 1998) (wives of applicants were not officers, shareholders or participants in husbands' business, American Security Bank v. York, 1992 WL 237375 (D.D.C. 1992) (wives who had no ownership interest in business and played no role in loan negotiations not joint applicants). In the instant case the Plaintiff was not connected to the underlying transaction. In Riggs the husband applied for a loan to refinance and renovate an office building owned solely by his wife, and listed on financial statements submitted in support of his application not only assets that he owned jointly with his wife, but also additional properties owned solely by his wife. The wife, the court held, was "de facto a joint applicant for the loan." 427 Mass. At

107. In the instant case neither Antonio Gagliardi nor his wife the Plaintiff applied for loans to improve any jointly held property.

The regulations, 12 C.F.R. §202.2(f), define application as "an oral or written request for an extension of credit." The Plaintiff's undisputed testimony in her Affidavit is that she never applied for any loan or extension of credit. The Plaintiff did not sign any of the original credit instruments. She signed no credit instruments until required to do so at the Forbearance Agreement was signed. This brings her squarely within the rule of the Official Staff Interpretations of regulation B which caution that "someone whose signature is required by a creditor as a condition for granting the credit requested" does not thereby become a "joint applicant" 12 C.F.R. Part 202, §202.7.

The Plaintiff did not hold out jointly held assets to demonstrate her creditworthiness when AMG was negotiating the Forbearance Agreement. The fact that Sovereign may have determined, without consulting with the Plaintiff, that the Commercial property owned by the Plaintiff should be used to secure the 2 new notes (1.6 Million Note and 1 Million Note) does not make the Plaintiff an applicant, nor it does demonstrate that the Plaintiff personally had a "shared" or "common" interest in seeing that the Forbearance Agreement was signed. In fact, the exact opposite is true. The Plaintiff had no common interest in the Forbearance Agreement. This is because Sovereign had already determined, that in effect, AMG was not going to survive. See Affidavit of Bokelkamp paragraph 27. In addition, AMG was already overadvanced by $1,966,565.00. No money was disbursed by Sovereign and the Plaintiff received nothing. It must be remembered that the Guaranty was allegedly given to secure AMG's

promise to repay $2.6 million plus interest in 5 months (December 31, 2004). This
Sovereign knew was impossible. There is no a "common interest" at all.

The Plaintiff's total lack of involvement in AMG can hardly be compared to the
involvement of the defendant in Baybank in the business of her co-applicant. See 427
Mass. At 572 ("The defendant apparently often assisted [her son] financially. During the
period from 1984 to 1994, for example, she gave over $650,000 to [her son] or to other
individuals on his behalf."). In the instant case the Plaintiff's total lack involvement with
the loan at issue here is nothing like the situation in Midlantic, where wife was co-owner
of a holding company that used loan proceeds to acquire banks, or Riggs, where the
borrowed funds were used to renovate the wife's apartment building.

On these facts, the Plaintiff can not be considered a "de facto", contemporaneous
applicant with a shared interest in the "credit requested" by AMG, or even assuming
*arguendo* Antonio Gagliardi. The Court should reject the Defendants argument that the
Plaintiff was a "joint applicant" for purpose of an ECOA analysis, and consider whether
there were any permissible basis for requiring the Plaintiff to undertake personal liability
under the 2004 Guaranty.

## THERE IS NO PERMISSIBLE BASIS FOR REQUIRING THE GUARANTY OF THE PLAINTIFF

The Defendant, in its argument before the Court during the hearing for
Preliminary Injunction, repeatedly stated that Sovereign lawfully required the Plaintiff to
sign a Guaranty on the "credit" sought by AMG, because she was the joint owner of
various properties listed as assets by her husband Mr. Antonio Gagliardi. Sovereign
repeatedly referred to "ECOA regulations" which supposedly authorized Sovereign

9

position. However, a review of the regulations indicates that the Court should reject this argument as well.

## § 202.7(d)(2) THROUGH (d)(5)
## SECTION 202.7(d)(5)

Section 202.7(d)(5) states:

> *"Additional parties.* If, under a creditor's standards of creditworthiness, the personal liability of an additional party is necessary to support the credit requested, applicant's spouse may serve as an additional party, but the creditor **shall not require the spouse be the additional party** (emphasis applied)."

Section 202.7(d)(5) above contains the precise language which forbids the requirement that the Plaintiff sign a Guaranty. The Forbearance Agreement itself, as can be seen in section 10a (1), requires that Ann Gagliardi sign a Limited Recourse Guaranty. Section 202.7(d)(5) above must be read to invalidate that guaranty. **This is true even if Sovereign had evaluated the creditworthiness of the applicant, which the Plaintiff respectfully suggests never occurred. Since Sovereign has argued that Antonio sought the Forbearance Agreement, then they are arguing that he sought an extension of credit. Section 202.7(d)(5) prohibits Sovereign from requiring that the Plaintiff be an additional party because she is the spouse of Antonio. This is true even if Antonio was not creditworthy.**

Sections 202.7(d)(2) through (d)(5) of the ECOA regulations create specific exceptions to the general rule that a non-applicant spouse may not be required to sign a Guaranty for a loan sought by a creditworthy spouse. It is critical for the Court to realize that there is nothing to indicate that the Plaintiff's husband was not creditworthy. In fact, in the Forbearance Agreement, on page 15, under the heading "Additional Funding" (See attached as Exhibit 3) Sovereign had specifically included a provision in which Sovereign

10

"might" loan an additional $150,000 to Mr. Antonio Gagliardi if he applied for the loan by July 15, 2004 (this was one day before the Forbearance Agreement was signed). The fact Antonio Gagliardi could not have possibly complied with the timing requirements for this additional funding is indicative of a numbers of important issues. However, the issue applicable to ECOA is whether Sovereign had determined that Antonio Gagliardi was not creditworthy. It must be understood that paragraph 29 of the Bokelkamp Affidavit states that Antonio Gagliardi in June of 2004 submitted his financial statement to Sovereign. Therefore, Sovereign can not deny that the financial information necessary for a creditworthiness analysis of Antonio Gagliardi was in hands of Sovereign long before the Plaintiff was required to sign the Guaranty. What is clear, is that Sovereign, having already seen his financial statements as part of the forbearance negotiations failed to determine whether he was creditworthy or not for a $150,000.00 loan. This can be seen by the fact that apparently Sovereign could not determined whether Antonio Gagliardi was creditworthy unless he submitted a "loan application". This would mean that Sovereign had not made a creditworthiness analysis of Antonio Gagliardi at all at the time of signing of the Guaranty by Antonio's wife.

Section 202.7(d)(3) concerns property held by an applicant in community property states, and thus is not relevant to Massachusetts. Section 202.7(d)(4) concerns the requirement that a non-applicant spouse sign a mortgage in order to make available to the creditor property offered by the applicant as security for repayment of the credit. The fact that this section shows that Sovereign could have required her to sign a Mortgage is missing the point. If the Guaranty violates ECOA then the Mortgage securing the illegal Guaranty fails. The Defendant's reliance on cases holding that ECOA violations do not

11

void the entire underlying credit transaction completely misses this point because the Plaintiff's mortgage is not the underlying transaction. In validating her mortgage is unrelated to the validity of $2.6 million loan between AMG and Sovereign.

In a recent case the Superior Court granted a Plaintiff's application for a Preliminary Injunction against the foreclosure of her and her husband's property, which a bank opposed with precisely the same argument that Sovereign now advances. Judge Grabau ruled that plaintiff (wife) was indeed entitled to contest her personal liability on the basis of the alleged ECOA violations, citing as persuasive authority the many cases which hold that ECOA, while it does not void the underlying transaction as a whole, may nevertheless be raised as a defense by the individual who was wrongly brought into the credit transaction. Judge Grabau unequivocally concluded that **"if[the bank predecessor] did in fact violate ECOA, then [plaintiff] may have a valid defense and obtain relief from her obligations under the note and mortgage." Memorandum of Decision and Order** (October 4, 1996, Grabau, J.) (emphasis supplied). A copy of Judge Grabau's Order is attached and incorporated by reference herein as Exhibit 1.

Reversing the lower court's order of dismissal for failure to state a claim, the Third Circuit Court of Appeals held that a guarantor who alleges that her signature was illegally obtained in violation of ECOA is entitled, despite the passage of the statute of limitations to bring suit seeking equitable relief from her obligation in defense to the creditor's attempts to enforce the debt. *Silverman v. Eastrich Multiple Investor Fund,* LP 51 F.3d 28, 32 (3d Cir. 1995). This decision reflects the prevailing point of view on this issue among federal and state courts. *See, e.g., Sony Electronics, Inc. v. S.G. Putman, Jr.,* 906 F.Supp.228, 229 (D.N.J. 1995); *FDIC v. Medmark,* 897 F.Supp.511,

12

514 (D.Kan. 1995); *Integra Bank/Pittsburgh v. Freema,* 839 F. Supp. 326, 330 (E.D. Pa 1993); *American Security Bank v. York*, 1992 WL 237375 (D.D.C. 1992); *Mundaca Inc. Corp. v. Emery*, 674 A.2d 923, 925 (Me. 1996); *Eure v. Jefferson National Bank*, 448 S.E.2d 417, 420-421 (Va. 1994). According to the *Silverman* court, "[w]hile an ECOA violation should not void the underlying credit transaction, an offending creditor should not be permitted to look for payment to parties who, but for the ECOA violation, would not have incurred personal liability on the underlying debt in the first instance." 51 F.3d at 32, *quoting from, Integra Bank/Pittsburgh v. Freeman*, 839 F. Supp. at 329. "To permit creditors – especially sophisticated creditors – to affirmatively benefit by disregarding the requirements of ECOA would seriously undermine the Congressional intent to eradicate gender and marital status based credit discrimination." *Silverman v. Eastrich Multiple Investor Fund, LP*, 51 F.3d at 32. "To deny [an individual] whose personal liability was illegally incurred] the right to use the ECOA violation defensively would be to enforce conduct that is forbidden by the Act." *Eure v. Jefferson Nat. Bank*, 448 S.E.2d at 421. In the instant case Sovereign attempt to enforce the debt against the Plaintiff results in foreclosure on mortgage securing that illegal obligation.

Thus, even if the underlying loan from Sovereign to AMG remains valid, Mrs. Ann Gagliardi retains the right under ECOA to seek equitable relief from her personal liability under the Guaranty. To release the Plaintiff and void her mortgage would not void the underlying transaction and Sovereign would remain free to pursue recovery against AMG, Anthony Gagliardi and Mr. Antonio Gagliardi subject, of course, to Antonio Gagliardi's own defenses.

Section 202.7(d)(2) creates an exception to the general rule that a creditor may not require a non-applicant spouse's signature on a credit instrument [including a Guaranty], in connection with loan to a creditworthy applicant. The exception applies when the applicant seeks an UNSECURED loan and demonstrates creditworthiness by relying in part upon property held jointly with a spouse. **The Court may recall that Sovereign's counsel asserted that the loan was a "secured" loan. As such Sovereign is estopped from now claiming that this section applies to the loan.** Section 202.7(d)(2) states:

> "*Unsecured credit.* If an applicant requests **unsecured credit** and relies in part upon property that the applicant owns jointly with another person to satisfy the creditor's standards of creditworthiness, the creditor may require the signature of the person only on the instrument(s) necessary, or reasonably believed by the creditor to be necessary, under the law of the state in which the property is located, to enable the creditor to reach the property being relied upon in the event of death or default of the applicant."

The court may recall that Sovereign's counsel specifically read from this section at the hearing and attempted convince the Court that this section authorize Sovereign to require the Guaranty. Obviously, Sovereign's counsel avoided reading the first part of this section in which it clearly states that the exception only applies to **unsecured loans**. The very title of that section is "**Unsecured loans**".

Even if the loan had been unsecured, which had not been, it was not necessary to obtain the Plaintiff's signature on the Guaranty in order to have access to the joint property in the event of default. No signature on credit instrument is necessary under the law in Massachusetts in order to have valid mortgage. Thus, Sovereign is wrong on two counts.

In case of Cadle Company v. Boston Investors Group, L.P., 1997 WL 106904,

14

the United Stated District Court for the District of Boston (Judge Young) specifically

dealt with the law in Massachusetts in connection with the argument that a credit

instruments had to be signed in order to have a valid mortgage. In dealing with this issue,

Judge Young stated as follows:

> "Regrettably, this is an erroneous statement of law. Massachusetts
> law recognizes that a mortgage may secure the obligation of a third
> party. The Supreme Judicial Court has stated that "[a] mortgage
> … may exist without there being any debt or any personal liability
> of the mortgagor." *Perry v. Miller*, 330 Mass.261, 263, 112 N.E.2d
> 805 (1953) (citing *Rice v. Rice*, 21 Mass [4 Pick.] 349, 352 [1826];
> *Cambell v. Dearborn*, 109 Mass. 130, 144 [1872]; *Cook v.
> Johnson*, 165 Mass. 245, 247 [1896]; *Pearson v. Mulloney*, 289
> Mass. 508, 515 [1935]; *see also Cook v. Johnson*, 165, 245, 247,
> 43 N.E.96 (1896) ("it is well settled that there may be a **mortgage**
> without personal liability on the part of the mortgagor for the debt
> which the **mortgage** secures"). The Bankruptcy Court therefore
> erred as matter of law in ruling that the second **mortgage** was a
> legal nullity on the ground that id did not support an obligation of
> the mortgagor. FN2" Id. Cadle.

> "FN2. Although no recent Massachusetts case addresses the issue,
> the Supreme Judicial Court has not overruled this long standing
> rule of law in the Commonwealth. Indeed, a comprehensive search
> reveals that the rule that a **mortgage** may secure an obligation of a
> third party is, in fact, the majority rule. *See In re Farris*, 194 B.R.
> 931, 939j (BAnkr.E.D.Pa.1996) (applying Pennsylvania law); *In re
> Belknap*, 174 B.R. 182, 183 (Bankr.W.D.N.Y.1994) (applying
> New York law); *In re Torrez*, 132 B.R. 924, 942
> (Bankr.E.D.Cal.1991) (applying California law); *Continental Bank
> of Pa. v. Barclay Riding Academy, Inc.*, 93 N.J. 153, 459 A.2d
> 1163, 1172 (N.J.), *cert. denied*,465 U.S. 994, 104 S.Ct. 488, 78
> L.Ed.2d 684 (1983). *But see Conty of Keith v. Fuller*, 234 Neb.
> 518, 452 N.W.2d 25, 30 (Neb.1990)." Id FN2.

The Plaintiff respectfully suggests that it would seem likely, given the majority

rule, that the above quotes and cases were known to Sovereign at the time of its

presentation to this Court. The Plaintiff also respectfully points out that any creditor who

claims it reasonably believed it could require a guaranty, under the instant facts, must be

ignorant of the well settled law going back to 1826 (*Rice v. Rice*) and repeatedly upheld by Massachusetts courts for nearly 200 years. Nor can Sovereign attempt to blame the illegal guaranty on "the advice of counsel". The Plaintiff directs the attention of the Court to the Bokelkamp Affidavit in which he claims to have required the Guaranty because that was his practice and he was advised to do so by Reimer and Braunstein, Sovereign's counsel at the time of the loan. See Bokelkamp affidavit para. 30. While the disclosure by Bokelkamp of the advise of Sovereign's counsel may well be a waiver of Attorney Client Privilege, it is hardly a justification for the disregard of two hundred years of precedent in Massachusetts as well as the majority view around the country.

The Court may recall that Sovereign cited to two Superior decisions and to a SJC decision. The Superior court decisions are simply wrong and the SJC decision is inapplicable because the facts and circumstances are materially different from the instant case. In any event those decisions hardly represent the "majority rule" as identified by Judge Young.

### SOVEREIGN VIOLATED ECOA BECAUSE IT NEVER KNEW THE VALUE OF THE PROPERTY PRIOR TO REQUIRING THE PLAINTIFF SIGN THE GUARANTY

There is a further reason why Sovereign could not require the Plaintiff's signature on a Guaranty. The Lender could have simply required the Plaintiff sign a mortgage. See 12 C.F.R. Part 202, §202.7 (under ECOA, where "applicant's interest in the jointly owned property does not support the amount and terms of credit sought," creditor may offer "to grant the applicant's request on a secured basis"). The Official Staff Interpretation of ECOA regulation, Section 202.7(d)(2), states that a creditor must first determine whether the value of an applicant's interest in jointly owned property at the

time of the application makes the applicant creditworthy (assuming an unsecured loan); only if the answer is no, can the creditor lawfully require the signature of a non–applicant on an instrument (the Mortgage) which "ensures access to the applicant's interest in jointly held property in the event of the applicant's death or default." Even then, however, no such instrument may impose personal liability unless necessary under state law (e.g., a limited guarantee)." Id.  What is absolutely clear is that just as with AMG, Sovereign never determined the value of the Antonio Gagliardi's interest in the property because the Forbearance Agreement itself states that Sovereign was unaware of the value of the property at the time it required Plaintiff's Guaranty at the Forbearance Agreement.

## SOVEREIGN'S OWN DOCUMENTS REVEAL THAT SOVEREIGN MADE NO CREDIT WORTHINESS ANALYSIS

Thus, it is clear that the entire "creditworthiness" analysis raised by Sovereign is bogus. **This conclusion is made directly from the documents submitted to this Court by Sovereign itself.  The unmistakable conclusion from these documents is that Sovereign did not make a creditworthiness analysis and has raised defenses in connection with same in bad faith.  This is important because this Court had stated that the burden of prove on whether Antonio was creditworthy, is on the Plaintiff. While Plaintiff does not concede that point, it is clear that the assertion by Sovereign that it needed the Guaranty of Plaintiff is unfounded, at best, and deliberately misleading the Court at worst.**

### THE LIMITED RECOURCE GUARANTY

Sovereign required the Plaintiff to guarantee $2.6 million dollar notes to the extent of her share of the proceeds realized by Sovereign from a foreclosure on the real

estate which was mortgaged by the Plaintiff to secure the Guaranty. In addition, the 6 page Limited Recourse Guaranty, attached as Exhibit 2, contains various other burdens on the Plaintiff including the fact that she would have to act as Trustee for Sovereign to the extent that she receive any funds from AMG. It also prevented the Plaintiff from collecting any fund or suing for any funds from AMG. See page 3 and 4 of the Limited Recourse Guaranty. Additionally, Sovereign required Ann to sign an Assignment of Leases and Rents which was given as collateral, in addition the mortgage, securing the Limited Recourse Guaranty. This Assignment of Leases and Rents allows Sovereign to continue to divert funds from the Plaintiff where such funds originated from the rents of the property. Sovereign can do this indefinitely without regard to the value of Ann's interest in the Stoughton property. In other words, since Sovereign did not know the value of the Stoughton property, the Assignment of Leases and Rents in affect, converted a Limited Recourse Guaranty into an Unlimited Guaranty. There is absolutely nothing in the Assignment of Leases and Rents which would have stopped the collection of income from the Stoughton property once that income exceeded the value of Ann's share in the property, whatever that might be.

The blatant effort to violate ECOA is revealed by the use of the Limited Recourse Guaranty. It was intended to violate the statute while at the same time apparently suggesting that the Guaranty gave no more to Sovereign then Sovereign would have had if it had simply obtained the mortgage. However, a close reading of the Limited Recourse Guaranty indicates otherwise. That Guaranty is illegal under ECOA. The Guaranty clearly states that the Mortgage secures the Guaranty. As such, the Guaranty renders the Plaintiff's Mortgage and Assignment of Leases and Rents invalid.

## THE COURT NEED NOT LOOK SOLELY TO ECOA IN ORDER TO ESTABLISH THAT THE PLAINTIFF HAS A REASONABLE LIKELIHOOD OF SUCCESS ON MERITS

Given all of the above, the Plaintiff respectfully suggests that the she has a reasonable likelihood of successes on merits on the ECOA claim. During the hearing, the Court focused on the fact that ECOA was the Federal Law which was the basis for the Court's jurisdiction in this matter. Further, the Court suggested that, based upon the information before it at the time of the hearing, it was not clear that the Plaintiff could bear her burden of demonstrating that she had a reasonable likelihood of success on merits. The above case law demonstrates that under ECOA, the Plaintiff has a reasonable likelihood to prove her case and invalidate the Mortgage and the Assignment of Leases and Rents. In addition, it is likely that the additional counts of Conspiracy and Fraud in the Inducement in the First Amended Complaint and Demand for Jury Trial, also provide the Plaintiff with a reasonable likelihood of success as it relates to those claims. The Plaintiff respectfully suggests that even if the Court were to conclude, at this point that it is not clear that the ECOA claim will prevail, it does not mean that the Court no longer has jurisdiction in this matter or that the ECOA claim cannot continue. The Plaintiff may prove ECOA at the time of trial or sooner based on discovery. That possibility however, does not prevent the Court from looking at the likelihood of success based upon the extraordinary circumstances which so strongly suggest Fraud in the Inducement and Conspiracy. The Court may issue the Preliminary Injunction against the foreclosure based upon the likelihood of success on the Plaintiff's non-federal claims. In order to determine the likelihood of success on the Fraud in the Inducement and Conspiracy claims, the Court may rely on essentially the same information that is the basis for the

19

ECOA claim.  That includes the fact that the Forbearance Agreement itself as well as the new notes were entered into without <u>any</u> analysis of the business plan, the bond issue, or the value of the collateral.  Further, the Forbearance Agreement itself is devoid of any references to the issues referred to by Bokelkamp in his affidavit.  These issues include the fact that prior to the execution of the Forbearance Agreement and the Guaranty, Sovereign had already determined, in affect, that AMG was not going to survive.  There was absolutely no disclosure in any of the documents whereby Sovereign informed the Plaintiff of the dire circumstances facing AMG.  Certainly, if it had, then the Plaintiff would have never signed any documents.  The reasonable likelihood of success is further demonstrated by the incomprehensible contradiction between the Bokelkamp Affidavit and the fact that the new notes were entered into without creditworthiness analysis.  This contradiction is so apparent and troublesome as to suggest a deliberate attempt to create documents which did not reflect the facts and circumstances that existed at the time.  Sovereign elected to act in a highly unethical way.  The Plaintiff has already supplied the Court with substantial case law concerning the withholding of material information from a borrower or a guarantor by a bank.  The documents of Sovereign reveal that the information was withheld in violation of M.G.L. c. 93A.  Since there is a 93A count in the First Amended Complaint, the Plaintiff respectfully suggests there is a reasonable likelihood of success on that count as well.  The Plaintiff respectfully suggests that the ECOA claim is extremely strong given the documents submitted to the Court by the Defendant Sovereign bank.

Respectfully Submitted,

Mrs. Ann Gagliardi,
By her counsel,

Dated:  September 9, 2005

Michael C. McLaughlin, Esq.
(BBO# 367350)
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 227-2275

Certificate of Service
hereby certify that a true copy of the above document
was served upon the attorney of record for each party
by mail / by hand on

Michael C. McLaughlin

21

## CERTIFICATION UNDER OCAL RULES 7.1

I, Michael C. McLaughlin, certify that I have conferred with opposing counsel and have attempted in good faith to resolve and narrow the issue.

Dated: September 9, 2005

Michael C. McLaughlin, Esq.
BBO# 337350
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 227-2275

Certificate of Service
hereby certify that a true copy of the above document
was served upon the attorney of record for each party
by mail / by hand on

Michael C. McLaughlin

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MRS. ANN GAGLIARDI

V.                          CASE NO. 05-10859-NG

SOVEREIGN BANK

## NOTICE OF FILING WITH CLERK'S OFFICE

Notice is hereby given that the documents, exhibits or attachments listed below
have been manually filed with the Court and are available in paper form only:

Exhibits 1 to 3 of Supplemental Memorandum in Support of Plaintiff Mrs. Ann
Gagliardi's Motion for Preliminary Injunction Based upon the Plaintiff's First Amended
Complaint and Demand for Jury Trial:

Exhibit 1 - Robert D. Kodis & another v. State Street Bank and Trust Company,
    as trustee.................................................................15 pages
Exhibit 2 - Limited Recourse Guaranty............................................6 pages
Exhibit 3 - Forbearance Agreement...............................................25 pages

The original documents are maintained in the case file in the Clerk's Office.

Date: September 9, 2005

Michael C. McLaughlin, Esq.
BBO# 337350
Law Offices of Michael C. McLaughlin
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 227-2275
**Attorney for** Mrs. Ann Gagliardi, the Plaintiff