UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANN GAGLIARDI
    Plaintiff

v.                                      Civil Action No.
                                          05-10859-NG

SOVEREIGN BANK
    Defendant

## DEFENDANT'S REPLY TO PLAINTIFF'S THREE SUPPLEMENTAL MEMORANDA

Defendant Sovereign Bank ("Sovereign") hereby replies to the three supplemental memoranda submitted by plaintiff. Each one supposedly boosts plaintiff's weak case on the merits, but an examination of the facts and the law reveals their contents to be distortions and half truths, as explained below.

**Bokelkamp Affidavit**
(addressed in Supplemental Memorandum filed August 26, 2005)

In opposition to plaintiff's motion for preliminary injunction, Sovereign submitted an Affidavit of Bret E. Bokelkamp, the officer in the bank's managed assets division who had responsibility for the loan to AMG after it went into default in early 2004. Plaintiff's first Supplemental Memorandum, filed August 26, 2005, takes various statements contained in the affidavit and misportrays them as though they were a revelation that the bank had a nefarious strategy to suppress facts about AMG in order to induce a naive Ann Gagliardi to sign a limited guaranty and mortgage to collateralize the loan.

First, the law is clear that even if Sovereign had failed to disclose AMG's financial condition to Ann, it is not liable. In *Safety Fund National Bank v. Plante*, 1995

Mass. Super. Lexis 421 (1995), a borrower was in default and the bank agreed to a forbearance on the condition that the guarantors execute guaranties and deliver personal financial statements to the bank. The guarantors later argued that the bank failed to disclose to them that the borrower lacked the financial ability to repay the note, and that this constituted misrepresentation. The court dealt with that argument by saying "[t]he short answer to this argument is that, in the absence of a duty to disclose, there is no liability for nondisclosure. . . There was no fiduciary relationship between the bank and the [guarantors]. . . As a matter of law, there was no duty to disclose and no misrepresentation." In *Shawmut Bank, N.A. v. Wayman*, 34 Mass. App. Ct. 20, 1993 Mass. App. Lexis 44 (1993), the Appeals Court dealt with similar claims and found that the bank owed no duty to the guarantor to exercise reasonable care. The court stated that "a bank is under no duty to the guarantor of a commercial loan to exercise due care in dealing with the borrower or determining whether to make the loan. . ." These cases should dispose of plaintiff's arguments and innuendos that the bank did something wrong in not giving Ann Gagliardi certain information about AMG.

Moreover, Ann Gagliardi is not a stranger to AMG's business, as the relationship among the parties shows. The borrowing entity, AMG Construction Company, Inc., is run by Anthony Gagliardi, son of Ann and Antonio Gagliardi. Anthony has undergraduate and graduate degrees from Bentley College, and is the president of the company. (Quinlan Depo.)[1] His father Antonio is on AMG's board of directors, and owns a 30% share of the company.[2] Anthony's sister Gina was or is the clerk of the

---

[1] These facts were given under oath by Edward Quinlan at the first day of his deposition on September 19, 2005. The transcript is not yet available.
[2] The holding of stock in AMG was reported on Antonio's and Ann's personal financial statements submitted to the bank. *See Exhibit 1.*

corporation. Gina is a real estate lawyer who practices with Gilmartin, Magence, Camiel & Ross LLP in Boston.[3] Both Anthony and Antonio were employees of AMG, Anthony as president and his father as vice president, and both received salaries from the company. Ann was or is employed as a travel agent for Adam Travel Services in Boston.

As a result of the familial relationships, it is unfair to portray Ann as ignorant of AMG's operations. Both her children are educated professionals and are involved with the company. Her own household income was based in part on her husband's earnings from AMG. The Stoughton property she jointly owns with her husband housed AMG's offices. Because her family members were intimately involved with the company and she was the company's landlord, she either knew or had access to information about the company's financial condition. This is not a situation where a naive guarantor was relying on the bank to provide information about the borrower.

In fact, Ann was not relying on the bank for any information at all, as she either had the company's financial information from her family, or could get it through Attorney Edward Quinlan who represented her and her husband Antonio, her son Anthony and AMG. Mr. Quinlan had unfettered access to AMG's financial reports, and a full understanding of the legal issues involved in the forbearance.[4] He represented all the parties in connection with the original loan and again in connection with the forbearance, negotiating financial and legal terms on behalf of his clients.

---

[3] Gina Gagliardi apparently understands the importance of hiring an attorney for a real estate transaction, given her writing on the subject. *See Exhibit 2*. Ms. Gagliardi also attended the court hearing on September 1, 2005 on plaintiff's (her mother's) motion for preliminary injunction.

[4] Mr. Quinlan may claim that he did not represent Ann or Antonio. The facts, as set forth below, show that he did, or at the very least, that the bank reasonably relied on his apparent authority to represent them in connection with both the 2001 loan and the 2004 forbearance.

3

In 2001, when the bank originally made the loan to AMG, Mr. Quinlan acted on behalf of Ann, Antonio, Anthony and AMG. Antonio was asked to sign an unlimited guaranty of AMG's debt, and Ann and Antonio were asked to sign a Non-Encumbrance Certificate with regard to the property they jointly owned at 331 Page Street in Stoughton. Mr. Quinlan corresponded with the bank's counsel, Reimer & Braunstein, about the required documents, and told Anthony what would be required from him and his father. In connection with Ann's and Antonio's Stoughton property, Mr. Quinlan had his paralegal obtain the deed from the Norfolk Registry of Deeds and run the property through the title index, and then forwarded information on the status of title to the bank's counsel. He ordered a municipal lien certificate from the town of Stoughton for the closing.

The bank's counsel Reimer & Braunstein forwarded Mr. Quinlan a draft Non-Encumbrance Agreement to be signed by Ann and Antonio and invited him to comment on the draft. Reimer & Braunstein also asked Mr. Quinlan to coordinate Ann's execution of the document, as she did not plan to attend the loan closing. Mr. Quinlan took the draft agreement on behalf of Ann and Antonio and made a few handwritten changes and additions. He also volunteered to arrange for Ann and Antonio's execution of the final agreement, and even asked if Reimer & Braunstein had any objection to their daughter Gina taking the acknowledgements. The recorded Non-Encumbrance Agreement shows that Gina did take the acknowledgements, as Mr. Quinlan had suggested.[5] The facts

---

[5] Quinlan Deposition Exhibits 6, 13, 16, 17, 18, 20, 21 and 22 are attached collectively as *Exhibit 3*. Paragraph 6 of Quinlan Ex. 13 is redacted because, after it was produced in discovery, AMG's counsel claimed it contained privileged material and was inadvertently produced. For reasons of professional courtesy, the undersigned offered to substitute a redacted page in the deposition exhibit, but AMG's counsel has not responded as to whether that is acceptable. While discussions ensue, a redacted page is used for this exhibit, with the bank reserving its rights with respect to the claim of inadvertent disclosure.

demonstrate that Mr. Quinlan was representing Ann and Antonio in connection with the 2001 loan, or at the very least, that he had apparent authority to represent them. At no time did Mr. Quinlan tell the bank he did not represent Ann and Antonio.[6]

In 2004, AMG went into default. The default arose because AMG's eligible accounts receivable, which were used in calculating how much AMG was entitled to borrow under the revolving line of credit, declined precipitously. The eligible accounts and the availability under the line of credit, as reported by AMG itself, were:

| Date | Eligible AR | Net Availability |
| --- | --- | --- |
| as of 12-12-03 | $2,749,751 | $372,573 |
| as of 2-5-04 | $2,433,579 | ($494,232) |
| as of 4-15-04 | $1,262,238 | ($1,562,456) |
| as of 5-15-04 | $757,102 | ($1,966,565) |
| as of 6-9-04 | $779,022 | ($1,949,029) |

In the first two months of 2004, AMG drew more under the line of credit than was available, and then the receivables dipped by over $1 million. The cash flow from AMG's operations were no longer enough to secure the bank or allow for any more advances.

Mr. Quinlan was intimately involved in representing AMG and Anthony in dealing with the legal and business aspects of the forbearance. He also represented Ann and Antonio in connection with posting the Stoughton property as collateral for the debt, the same property as to which they had signed the Non-Encumbrance Agreement in 2001.

As part of the forbearance negotiations, Mr. Quinlan talked to Bret Bokelkamp and an in-house lawyer at the bank, he met with the bank's lawyers at Reimer &

---

[6] Gina Gagliardi has not yet been deposed so the extent of her representation of her parents is not yet known.

Braunstein to negotiate a forbearance agreement, he wrote numerous letters to Reimer & Braunstein, and he negotiated the language of the various documents that were eventually executed in July 2004 as part of the forbearance.[7] While he was working toward the forbearance, he had access to AMG's financial statements, including those that showed the decline in its accounts receivables and its overadvance under the line of credit. Mr. Quinlan also communicated with the company's accountant, Robert Brodsky, about the financials and the forbearance, and with its financial advisor, Philip Koser.[8]

Mr. Quinlan sent a memo directly to Bret Bokelkamp proposing terms for forbearance. *See Exhibit 5.* The memo specifically proposed that the debt be secured by mortgages on Ann's and Antonio's Stoughton property, as well as other property in Framingham. Mr. Quinlan also talked to Tom Durkin, AMG's bonding agent, and kept him abreast of the forbearance negotiations by sending him a copy of the same proposal he had sent to the bank. *See Exhibit 5.*

In response to Mr. Quinlan's proposal, Reimer & Braunstein prepared draft documents, including the limited guaranty to be signed by Ann Gagliardi, and the mortgage to the Stoughton property, and sent them to Mr. Quinlan for comment. On June 30, 2004, Mr. Quinlan told Reimer & Braunstein he needed to review the documents "particularly those affecting Ann Gagliardi with the individuals." *See AMG 0175, part of Exhibit 4.* The next day, July 1, 2004, Mr. Quinlan emailed his comments on Ann's

---

[7] Mr. Quinlan produced 531 pages of documents pursuant to a subpoena *duces tecum*. A select few illustrating his representation of AMG and the Gagliardis with regard to the forbearance, along with documents produced by others, are attached as *Exhibit 4*.

[8] Given the decline in receivables, the bank had limited confidence in Anthony's management ability, and required him to hire an outside business consultant. AMG decided to hire Philip Koser as its consultant. Although the bank questioned whether Mr. Koser had adequate business turnaround experience, it acquiesced in AMG's decision to hire him, as noted in Mr. Quinlan's memo of a conversation with Reimer & Braunstein. *See Quinlan 71, part of Exhibit 4.*

6

guaranty back to Reimer & Braunstein. *See Quinlan email to Mark Scott dated July 1, 2004, forwarded to Bret Bokelkamp, part of Exhibit 4.* On July 2, 2004, Reimer & Braunstein emailed back a revised draft of Ann's guaranty. *See Quinlan 531, part of Exhibit 4.* On July 8, 2004 Bret Bokelkamp emailed Anthony directly about some open issues including the guaranty from Ann, and asked Anthony to review the issues with Ed Quinlan. *See AMG 0302, part of Exhibit 4.* On July 15 Reimer & Braunstein emailed all the documents to Mr. Quinlan, including Ann's limited guaranty and the mortgage and assignment of rents to be executed by Ann and Antonio, so he could give them a final review before closing the next day. *See Quinlan 535, part of Exhibit 4.* Mr. Quinlan spent several hours that day reviewing the closing documents, according to his invoice. *See Exhibit 6.* His only comment back to Reimer & Braunstein, after extensive review of the documents, was to request a slight change in the mortgages, and to add his name and address to the section designating the individual who is to receive a copy of any legal notice. *See Quinlan email to Scott, July 15, 2004, part of Exhibit 4.* Also on July 15 Reimer & Braunstein asked Mr. Quinlan about the Gagliardis' availability for closing the next day. *See Quinlan 40, part of Exhibit 4.*

On July 16, 2004, Mr. Quinlan attended the closing at Reimer & Braunstein's offices with the three Gagliardis: Ann, Antonio and Anthony. According to his invoice, he had "conferences with Anthony Gagliardi, Antonio Gagliardi and Ann Gagliardi re: loan documents and related transactions."[9] *See Exhibit 6.* After the closing, Mr. Quinlan wrote to all three Gagliardis – Anthony, Ann and Antonio – and gave his opinion

---

[9] Mr. Quinlan testified at his deposition that he has had numerous conversations with Antonio Gagliardi, all in English. Although plaintiff's counsel has represented in certain court filings that he is unable to communicate with Antonio in English, Italian or in dialect through his daughter Gina. Mr. Quinlan, among others, communicates with Antonio in English.

7

that the forbearance documents they had just signed would "permit the Company to work itself out of its current financial predicament and hopefully achieve a level of stability which would allow further renegotiation of the loans and agreements." He also advised the Gagliardis, concerning the Stoughton and the Framingham properties, that "both of these real estate parcels can be refinanced" within certain limits, if AMG was not in default. *See Exhibit 7.*

After the forbearance was executed, the bonding agent wrote to the bank stating that it held AMG "in the highest regard and have given favorable consideration to providing bonds on single projects in the $5,000,000 range and overall work programs of $10,000,000." *See Exhibit 8.* So far as Sovereign knew, the forbearance agreement had allowed AMG to obtain bonding that otherwise was not available to it, and AMG was therefore in a position to continue to work on public contracts. The forbearance had only a positive effect on AMG's bonding situation until later, when AMG was thrown off the construction job in Avon, and its ability to get bonding dried up.

The foregoing facts demonstrate that Mr. Quinlan represented Ann and Antonio, or at the very least, had the apparent authority to do so, on which the bank reasonably relied. The bank had no financial data that AMG, its accountant, its financial advisor and its lawyer did not have, and because Ann shared a lawyer with AMG, Mr. Quinlan's knowledge and access must be imputed to Ann and his other clients. In no way did Sovereign take advantage of Ann, or any of the other Gagliardis. It simply negotiated for a forbearance agreement which Mr. Quinlan thought would "permit the Company to work itself out of its current financial predicament and hopefully achieve a level of stability which would allow further renegotiation of the loans and agreements" (*see*

*Exhibit 7*). Sovereign was equally hopeful that Mr. Quinlan was right and AMG would be able to work itself out of its predicament, and attain financial stability, as that would have allowed AMG to repay the loan. That AMG was not successful is due to its own actions, not to the bank's decision, in July 2004, to give the company more time before it enforced its rights and remedies. And even if the bank was not certain, in July 2004, that AMG would be successful, that does not preclude the bank from taking additional collateral. If the court were to adopt the standard advocated by plaintiff, that a bank must decide a workout will be successful before it can get anything in return for a forbearance, there will, effectively, be no more workouts, as banks will have no incentive to show any patience toward defaulted borrowers.

Plaintiff's first Supplemental Memorandum attempts to lay responsibility at Sovereign's door for Ann's having signed a limited guaranty and mortgage. Given the law, Ann's own access to the information and Mr. Quinlan's representation of her, plaintiff's arguments should be disregarded.

**Factual and Legal Claims**
(addressed in Supplemental Memorandum filed September 9, 2005)

Plaintiff filed a second Supplemental Memorandum on September 9, 2005 with a potpourri of facts and law. The more salient points are responded to here. Several outlandish factual claims should be noted in passing:

- Plaintiff seems to say that Sovereign did not have enough information to make a credit evaluation of AMG. It is true that AMG could have been more forthcoming about its financial condition, but suffice it to say that the bank insisted AMG provide periodic financial reports as required under the loan

9

documents, in addition to borrowing base certificates. In May, 2004, the bank asked for enhanced financial reports (cash flow forecasts, income statements and balance sheets), and met with AMG's accountant Robert Brodsky. *See AMG 298 attached as part of Exhibit 4.* The bank also insisted AMG hire an independent financial consultant, and AMG chose Philip Koser who met with the bank and provided it with financial information. The bank also obtained personal financial statements from Ann and Antonio Gagliardi (*see Exhibit 1*) and from Anthony and his wife. From this information, Sovereign determined that AMG was not creditworthy, the debt was undersecured, and the individual guarantors were not capable of honoring the debt from their non-real estate assets. The only way to collateralize the loan, and persuade the bank to hold off on collection activities, was to put up real estate collateral. Accordingly, Mr. Quinlan suggested the debt be secured by real estate to the extent possible. Also, a real estate secured loan would present a better picture to the bonding agent (*see Exhibit 5*).

- Regarding bonding, it should be noted that Mr. Quinlan kept the bonding agent informed of the forbearance proposal he had made to the bank (*see Quinlan 82, attached as part of Exhibit 5*), and told the bank that the bonding agent was generally favorable about the proposed forbearance (*see Exhibit 5*). After the forbearance was signed, the bonding company had a positive reaction and extended AMG a new opportunity for bonding. (*See Exhibit 8*). Only after AMG was fired from the Avon job did its bonding dry up.

- Plaintiff also mentions the value of the collateral. Ann and Antonio, on their personal financial statements, had represented the market value of the Stoughton

property. (*See Exhibit 1*). After it became clear that the property would be posted as collateral, the bank ordered appraisals, the results of which were received after the forbearance was signed.

- Plaintiff alludes to the fact that two new notes were executed at the forbearance. As stated above, this arrangement was requested by Mr. Quinlan. He negotiated with the bank for the existing debt to be divided into two new amounts, with $1.6 million to be secured by real estate. This collateral arrangement he proposed would allow AMG to obtain a bonding line of $5 - $10 million, according to his proposal (*see Exhibit 5*), and the bank agreed to this arrangement.

- Plaintiff talks about a credit application from Antonio in connection with Section 13 (a) of the Forbearance Agreement.[10] This section has to do with a loan that Antonio contemplated applying for in order to make an additional capital contribution to AMG. (See also Defendant's Opposition to Plaintiff's Motion for Leave to File First Plaintiff's Amended Complaint, docket # 23.)

Plaintiff also mentions several cases, all of which are distinguishable or otherwise not applicable. The case of *Kodis v. State Street Bank and Trust Company*, Norfolk Superior Court, Civil Action No. 96-1637 (copy attached to plaintiff's Second Supplemental Memorandum), arose from completely different facts. The husband approached the bank for a loan for his business. The bank, acting through the president, who was also on the board of the husband's company and the personal attorney for both the husband and the wife, agreed to make the loan, but required that the wife sign the loan documents. The attorney told her that the bank always required the spouse's signature, and that in any event she had no exposure because both the company and her

---

[10] The Forbearance Agreement is *Exhibit 15* to the Affidavit of Bret E. Bokelkamp, docket # 10).

11

husband had the ability to repay the loan. The wife signed the mortgage, apparently in reliance on these statements and also apparently suffering from impairments to her legal capacity. Based on these singular facts, the court enjoined a foreclosure of their jointly owned residence.

As it all too obvious, the *Kodis* case is entirely distinguishable from the facts at hands with the Gagliardis. Sovereign took a limited guaranty from Ann Gagliardi only because she was a joint owner of the property that was to be used as collateral for her husband's unlimited guaranty of her son's company. Ann, and Antonio for that matter, was represented by independent counsel who negotiated strenuously with the bank for terms he considered favorable, including the collateral arrangement. Moreover, there has been no showing that Ann suffered from any impairment of her legal capacity.

The case of *Silverman v. Estrich Multiple Investor Fund*, 51 F. 3d 28 (3rd Cir. 1995), and other cases from foreign jurisdictions cited by plaintiff, also have no application here. Legally, *Silverman* dealt with standing and statute of limitations issues. Factually, the case dealt with a creditor seeking to impose personal liability on a spouse who had signed a guaranty. Here, Sovereign is not seeking to impose any personal liability on Ann Gagliardi, except to the extent of her joint ownership of the Stoughton property.

Finally, *The Cadle Company v. Boston Investors Group*, 1997 U.S. Dist. Lexis 2632 (D. Mass. 1997) involved a limited statement of the law, not at all dispositive of the questions at hand. The court found that a mortgage may be valid, even if the mortgagor is not liable under a separate debt obligation. The case relied on *Perry v. Miller*, 330 Mass. 261, 112 N.E. 2d 805 (1953) which involved a married woman who "during

coverture" became surety for her husband, and gave a valid mortgage of her separate estate to secure his repayment of a debt. The court held that a mortgage given by a wife for such a purpose requires no consideration. Again, this case has no bearing on the present case, where Ann and Antonio were joint owners of the Stoughton property. The instant case does not involve a wife using her own property to secure her husband's debt.

It is worth emphasizing that Ann's guaranty allowed the bank only limited recourse, to her interest in the Stoughton property. Sovereign did not take a guaranty that would entitle it to pursue her other assets. This limited purpose is permitted under the ECOA, 15 U.S.C. § 1691d, which states a "request for the signature of both parties to a marriage for the purpose of creating a valid lien. . . shall not constitute discrimination under this title."

Moreover, the safe harbor provisions of Section 202.7 (d) (4) of Regulation B allows a creditor to require the "signature of the applicant's spouse or other person on any instrument necessary, or reasonably believed by the creditor to be necessary, under applicable state law to make the property being offered as security available to satisfy the debt in the event of default. . ." As stated in the Bokelkamp Affidavit, taking a limited guaranty from the spouse who is the joint owner of the property to be mortgaged conformed to his prior experience, and was in accordance with the advice of counsel; in other words, the creditor reasonably believed the limited guaranty to be necessary, and it is therefore permissible under Regulation B. Also, Sovereign is entitled to rely on the fact that Mr. Quinlan, in representing Ann, never once suggested that the bank should not take a limited guaranty from her. Instead, he fine tuned the language of the draft guaranty and mortgage, and then attended the closing with Ann (as well as Antonio and

Anthony). His acceptance of the document, without questioning the necessity for it, only underscores the reasonableness of Sovereign's belief that a limited guaranty was necessary.[11]

Finally, even if the limited guaranty was not necessary, the mortgage lien on the Stoughton property remains valid. If plaintiff is entitled to a remedy at all, she can seek statutory damages for an ECOa violation, but the underlying mortgage is not disrupted and the bank is entitled to enforce its rights under the mortgage.

**Document production**
(addressed in Additional Supplemental Memorandum filed September 21, 2005)

In its third Supplemental Memorandum, plaintiff has chosen to bring before the court what should have been a normal conversation among lawyers about having a protective order signed, as an indication that something is amiss and needs judicial intervention. The proposed protective order is simple and straight forward, and is designed to limit the use of documents produced in discovery to the litigation now underway in federal and state court. Bank's counsel requested it before making copies of documents produced by the bank.

Some of the documents the bank is prepared to copy illustrate or reveal the inner workings of the bank and its financial analysis of certain debts. It is important to the bank that its analyses be kept out of the public realm. The protective order would cover documents produced in this litigation, and a parallel order would cover documents produced in the related state court litigation. They would not limit counsel's use of bank

---

[11] Ann's limited guaranty is *Exhibit 25* to the Bokelkamp Affidavit (docket #10).

14

documents for purposes of this litigation, but would simply contain their use to the pending lawsuits.

Factually, the issue arose this way. On September 15, 2005 plaintiff's counsel reviewed documents produced by the bank, and designated all of them for copying. Before making copies, bank counsel requested plaintiff's counsel to sign the protective order which would limit his and his client's use of the documents to the litigation now pending in federal and state court.[12] Bank's counsel circulated the draft protective orders on September 15, 2005 to Michael McLaughlin, who represents Ann Gagliardi in this case and her husband Antonio in the state court case, and also to Richard Nicholson who represents their son Anthony and the company AMG in the state court case. (A copy of the email circulating the drafts, and the proposed protective orders are attached as *Exhibit 9*). On September 16, 2005, plaintiff's counsel returned to review more documents, specifically those which had been produced pursuant to subpoena *duces tecum* by Edward Quinlan, so that he could prepare for the Quinlan deposition on September 19, 2005. Mr. Nicholson had not responded to the email of the day before, and the issues of the protective orders remained open. The undersigned called Mr. Nicholson who said he had not looked at the protective order yet, but would get back to her shortly.

The undersigned again asked Mr. Nicholson about it the protective order on September 19, 2005, after the Quinlan deposition had been suspended at Mr. McLaughlin's request, and he agreed to get back to her. Counsel sent a follow-up email to Mr. Nicholson and to a partner in his firm on September 21, 2005 (*Exhibit 10*) but still has not received a response. Because neither Mr. Nicholson nor Mr. Clancy responded,

---

[12] During review of the bank's documents, Mr. McLaughlin's assistant asked for a copy of one credit report. In order to accommodate Mr. McLaughlin, the undersigned made a single copy which he now attaches to his third supplemental memorandum.

the undersigned served a motion under Superior Court Rule 9A to have the proposed protective order entered as an order of the court.

It is important that both lawyers, Mr. McLaughlin and Mr. Nicholson, sign the protective order in both cases - federal and state – because of the nearly identical facts and substantially similar legal claims. For instance, Mr. McLaughlin has alleged nearly identical facts on behalf of Ann and Antonio Gagliardi in federal and state court, and 8 identical causes of action. If he believes that a bank document supports one of his claims in the federal case, he will undoubtedly want to use it in the state case, at which point Mr. Nicholson would gain access to it, and be free to release it to the public, or do anything else he pleases, unless he, too, is bound by the protective order. For that reason, it is important for the protective order to enter in both cases, so that both Mr. McLaughlin and Mr. Nicholson will be bound. Also, it is possible that the federal claims will be dismissed and this case remanded to state court. If both cases were pending in state court, they would likely be consolidated – all the more reason to have parallel protective orders entered in the two cases. All of this reasoning was stated in a letter to Mr. McLaughlin, a copy of which is attached as *Exhibit 11*.

**Conclusion**

Even with the additional arguments advanced in the three supplemental memoranda, plaintiff is not likely to succeed on the merits. She simply has not shown any likelihood that she will prevail on an ECOA claim. The facts and the law are against her, as demonstrated above, and her motion for preliminary injunction should be denied.

> DEFENDANT
> SOVEREIGN BANK
> by its attorney,
>
> /s/ Kathleen C. Stone
> Kathleen C. Stone
> BBO# 481920
> Looney, Cohen, Reagan & Aisenberg LLP
> 109 State Street
> Boston, MA 02109
> 617-371-1050

September 27, 2005

## CERTIFICATE OF SERVICE

I certify that on the 27th day of September, 2005 I caused to be mailed a copy of the foregoing, by hand, to:

Michael C. McLaughlin, Esq.
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, MA  02108

/s/Kathleen C. Stone
Kathleen C. Stone