UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10859-NG

_____
MRS. ANN GAGLIARDI,            )
                               )
            Plaintiff,         )
                               )
v.                             )
                               )
SOVEREIGN BANK,                )
                               )
            Defendant.         )
_____)

**PLAINTIFF MRS. ANN GAGLIARDI'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION PENDING APPEAL**

**Procedural History**

Now comes the Plaintiff, Mrs. Ann Gagliardi, pursuant to Fed. R. Civ. P. 65 and Fed. R. App. P. 8, and makes this Emergency Motion for Preliminary Injunction Pending Appeal of this Court's September 28, 2005 Memorandum and Order Re: Plaintiff's Motion for Preliminary Injunction (hereinafter referred as to "Order") denying the Plaintiff's Motion for Preliminary Injunction (appealed on October 5, 2005 to the First Circuit). **The Plaintiff alerts this Court to the fact that the Defendant Sovereign Bank will be foreclosing on the properties owned by Ann Gagliardi on November 22, 2005. The Plaintiff is required to ask this Court for a Preliminary Injunction Pending the Appeal. Given the extremely limited amount of time before the foreclosure, the Plaintiff respectfully points out that if the Court does not grant the Preliminary Injunction Pending Appeal that the Plaintiff is required to seek the Injunction from the Court of Appeals. The Plaintiff respectfully requests that the Court be mindful that the foreclosure is next Tuesday, November 22, 2005 (7 days). If the Court is not inclined to grant the Preliminary Injunction then the**

1

**Plaintiff must provide some prior notice to the Court of the First Circuit, so that the First Circuit can consider the Motion for Preliminary Injunction Pending Appeal.**

Since the denial of the Plaintiff's Motion for Preliminary Injunction, the Plaintiff has diligently undertaken discovery including the review of belatedly provided documents from Sovereign Bank, and has completed three hours of a 30(b)(6) deposition of Sovereign Bank, which occurred on November 9, 2005. The Plaintiff has caused the transcript to be produced in an expedited form so as to provide this Court with as much information and time as possible to consider the new information derived from discovery given the immediacy of the situation.

<u>THE GRANTING OF THE MOTION FOR PRELIMINARY INJUNCTION WILL NOT RESULT IN ANY HARM TO SOVEREIGN BANK</u>

As an preliminary matter and in further support of the Plaintiff's original motion for Preliminary Injunction in joining the foreclosure of Ann Gagliardi's property, the Plaintiff submits an affidavit of Andrew J. Boggini, a certified general real estate appraisal, licensed in Massachusetts and Rhode Island who has served as an expert in the United Bankruptcy Court District of Massachusetts. Mr. Boggini's affidavit makes clear that the property in question is not in danger of any demunition of value during next three or four months. See attached as Exhibit 16.

<u>DEFENDANT HAS REFUSED TO PROVIDE CRITICAL DOCUMENTS AND HAS INAPPROPRIATELY REFUSED TO ANSWER CRITICAL QUESTIONS IN THE 30(b)(6) DEPOSITION</u>

The combination of this Court's Order denying the Motion for Preliminary Injunction and the inappropriate refusal of Sovereign Bank to produce critically important documents and the refusal of Sovereign Bank to answer critically important questions during the 30 (b)(6) deposition, unfairly strips the Plaintiff of her opportunity to avail herself of complete discovery which supports the Plaintiff's assertion that the Defendant violated ECOA, M.G.L.

2

c. 93A and further demonstrates that the Plaintiff has reasonable likelihood of success on merits. This Court's opinion, on page 4, established that the Plaintiff had the burden of proving that the borrower, AMG, and the Plaintiff's husband Antonio Gagliardi, were creditworthy at the time the Plaintiff was required to sign a Mortgage and a Guaranty, and therefore, that the Plaintiff's signature was not needed in order for the Bank to extend the credit to AMG. The Court held that the Plaintiff did not demonstrate the reasonable likelihood of success on merits, either on ECOA claim or the other claims. This holding was made <u>prior to any discovery,</u> because Sovereign Bank had <u>refused</u> to produce documents under what appears to be a spurious claim that the documents which were required to be produced were somehow "proprietary and confidential". Some documents have been produced and reveal that the Plaintiff has the reasonable likelihood of successes on merits in the ECOA claim and the remaining claims.

      The Plaintiff respectfully suggests that the Court's holding regarding the burden of proof with respect to ECOA is incorrect. However, if the Plaintiff assumes for the purposes of this Motion, that this Court was correct, then the Plaintiff also suggests that Sovereign Bank <u>must</u> be required to provide all creditworthiness analyses, manuals, procedures, handbooks etc., by which the Plaintiff could examine the creditworthiness standards of the Bank. The Plaintiff is faced with this Court <u>requiring</u> that the Plaintiff to prove the creditworthiness of AMG and Antonio Gagliardi according to Sovereign Bank's standards of creditworthiness, while at the same time Sovereign Bank <u>refuses</u> to produce the documents necessary to examine such creditworthiness standards. Indeed, the Plaintiff served on Sovereign Bank an extensive document request on July 26, 2005. Sovereign Bank refused to provide the creditworthiness analysis, documents and manuals (See Defendant's Response to the Plaintiff's Document Request). As a result, <u>prior to this Court's denial of the Motion for Preliminary Injunction,</u> the Plaintiff filed a Motion to Compel the production of those

documents that would facilitate the examination of creditworthiness issues. That Motion to Compel was filed on September 21, 2005 (seven days before this Court's denial of the Preliminary Injunction). This Court has not acted on the Motion to Compel. The Foreclosure cannot be allowed to proceed under these extraordinary circumstances.

<u>SOVEREIGN BANK HAS REFUSED TO ANSWER CRITICAL QUESTIONS CONCERNIT CREDITWORTHINESS DURING THE 30(b)(6) DEPOSITION</u>

On November 9, 2005 the 30(b)(6) deposition of Sovereign Bank was taken. Sovereign Bank produced Bret E. Bokelkamp, as the sole individual to answer the matters noticed in Exhibit A of the 30(b)(6) deposition notice. Bokelkamp was unable to answer questions concerning important matters relating to accounting of the AMG loan as identified item #7 of Exhibit A. See attached as Exhibit 1. Bokelkamp testified that there were policies, procedures, lending manuals at Sovereign Bank but those items were not produced by the Bank. See page 87, line 15 – 22 of the deposition of Bokelkamp which is attached as Exhibit 2. Thus, not only has Sovereign Bank refused to provide documents necessary for the Plaintiff's alleged burden of proof, Sovereign Bank also refused to produce a 30(b)(6) deponent capable answering questions concerning policies, manuals, and procedures sought in the document discovery. See deposition of Bokelkamp, page 87, line 5 – 14.

More importantly, Mr. Bokelkamp, at the instruction of his counsel, refused to answer questions relating to ECOA matters referred in his affidavit which was submitted by Sovereign Bank in opposition to the Motion for Preliminary Injunction. At para. 30, page 8 of the Bokelkamp affidavit, Bokelkamp states as follows.

> "Further discussion ensued about additional collateral. It was agreed that the bank would take mortgages on 2 pieces of property, and that in connection with the mortgages Anthony Gagliardi, in his capacity as Trustee of the Anthony & Company Realty Trust (owner of 615 Concord Street) and Ann Gagliardi (co-owner of 331 Page Street) will execute limited recourse guaranties. **This course of action conformed to my prior experience as a bank officer as to how a bank takes a mortgage on property owned by a party who is not**

4

> **fully liable for the debt, either as borrower or unlimited guarantor, and conformed to the advice given by the bank's counsel at Reimer & Braunstein.** See para. 30 of Bokelkamp affidavit."

When Bokelkamp was asked about the advice referred to in his affidavit, Bokelkamp's counsel ordered him not to answer the question. Clearly, the affidavit of Bokelkamp discusses the advice the Bank received from its counsel, Reimer & Braunstein. Attached as Exhibit 2 is the transcript of the deposition of Bokelkamp in which Plaintiff's counsel actually offered to not to assert a broader waiver of attorney client privilege that would result from Bokelkamp answering the questions in relation to what the advice was given by Reimer & Braunstein concerning Mrs. Gagliardi's Guaranty. Nevertheless, Bokelkamp would not answer the questions. See deposition of Bokelkamp, page 208 line 6 through page 210 line 3.

Questions concerning the advice given by Reimer & Braunstein are materially important, because they relate to the Plaintiff's ECOA claim. As this Court is well aware, Sovereign Bank has argued that it was permitted to obtain the signature of the Plaintiff on a Guaranty based upon 12 C.F.R. section 202.7(d)(4). That section states as follows.

> "Secured credit. If an applicant requests secured credit, a creditor may require the signature of the applicant's spouse or other person on any instrument necessary, <u>or reasonably believed by the creditor</u> to be necessary, under applicable state law to make the property being offered as security available to satisfy the debt in the event of default, for example, an instrument to create a valid lien, pass clear title, waive inchoate rights, or sign earnings."

Sovereign Bank has stated that it required the Guaranty of the Plaintiff because it was advised to by Reimer & Braunstein. Apparently, Sovereign Bank believes that the advice, whether or not it was correct, provided Sovereign Bank with "reasonable belief that it was needed". In determining whether Sovereign Bank had a "reasonable belief" the Court must look to Official Staff Interpretation of Section 202.7(d)(4). This process was followed

precisely by the United States Bankruptcy Court in *Farris v. Jefferson Bank*, 194 B.R. 931 (1996). In *Farris* the Bankruptcy Corut quoted from the regulations.

> The interpretation of this section states, in pertinent part: *Need for signature-reasonable belief.* Generally, a signature to make the secured property available will only be needed on a security agreement. *A creditor's reasonable belief* that, to assure access to the property the spouse's signature is needed on an instrument that imposes personal liability *should be supported by a thorough review of pertinent statutory and decisional law or an opinion of the state attorney general.* Official Staff interpretation to § 202.7(d)(4). Id. 940.

The above quote makes clear that Sovereign Bank's "reasonable belief" would have had to have been supported by Reimer & Braunstein's thorough review of statutory and decisional law. As the Court is already aware, the Plaintiff has provided to this Court a Supplemental Memorandum replete with Massachusetts case law indicating that there is 200 years of decisional law by the Supreme Judicial Court making clear that the guaranty was not required under Massachusetts law. Certainly, Sovereign Bank did not obtain any opinion of the Commonwealth Attorney General that the guaranty would have been needed under Massachusetts law. The Official Staff Interpretation demonstrates how significant and material the issue of "reasonable belief" actually is. In *Farris* the Court said:

> "We find no evidence in the record that Jefferson based its belief that the debtor's signature on the note was necessary upon a review of the law, let alone a "thorough" review of the law. Id. 940. See attached decision of the Bankruptcy Court as Exhibit 3.

Again, Sovereign Bank submitted the Bokelkamp affidavit which contains a clear reference to the advice given by Reimer & Braunstein on this very issue. <u>The decision of the Sovereign Bank to refuse to answer questions relating to this material issue should be dispositive for the purposes of the current Motion for Preliminary Injunction Pending Appeal</u>. Every inference in favor of Mrs. Ann Gagliardi should be taken as a result of Bokelkamp's refusal to answer any question that relates to this issue.

6

<u>DISCOVERY HAS SHOWN THAT SOVEREIGN BANK HAS ALWAYS BEEN AWARE IT FACED SERIOUS LEGAL PROBLEMS IN ATTEMPT TO OBTAIN MRS. ANN GAGLIARDI'S ASSETS.</u>

It is very clear from documents provided in discovery <u>after this Court's decision</u>, that Sovereign Bank was fully aware that there were substantial legal problems with any attempt to obtain a guaranty and a mortgage from Ann Gagliardi. It is very likely that continued discovery will provide more evidence. The Court should keep in mind that due to the immediacy of the foreclosure and the need to complete this Motion, the Plaintiff has suspended the deposition of Bokelkamp notwithstanding the reasonable expectation that the additional dispositive evidence will come to light. The evidence discovered to date in addition what has been described above is as follows.

Exhibit 9 to the Bokelkmap deposition references the fact that the Bank has always known that it would have legal problems in connection with any attempts to attach Mrs. Ann Gagliardi assets (Exhibit 9 is inappropriately marked confidential and therefore is included in a separate envelope with other inappropriately documents marked confidential). Given the "confidential" designation, the Plaintiff cannot directly quote from Exhibit 9 in this Motion. However, it is attached for the Court's review as Exhibit 4 in a separate envelope.

Exhibit 13 to the Bokelkamp deposition, a June 24, 2004, document, on page 5 states:

> "As the guarantors appear to hold no assets separate from spousal interest, or where substantial portions of their declared net worth are in the from of beneficial interest trust, **there is no direct legal path by which bank can attach these assets without possible third defenses being raised."** See attached as Exhibit 5.

A document entitled Sovereign Bank Watched Assed Report produced by the Bank bates stamp number SB 0085– 0094, on page 3, dated 12/1/05 states:

> "As the guarantors appear to hold no assets separate from spousal interest, or where substantial portions of their declared net worths are in the form of beneficial interests in trusts, <u>there is no legal path by which the bank can attach these assets without possible third party defenses being raised</u>." See attached as Exhibit 6.

7

The above quotes should make clear, for the Court that Sovereign Bank believed there was <u>no legal path</u> to Mrs. Ann Gagliardi's property. Equally important is the fact that in document production Sovereign Bank has produced a Credit Policy Compliance Worksheet which is marked as SB 0167. This document demonstrates that the ECOA Regulation B was to be checked prior to obtaining the Guaranty of Mrs. Ann Gagliardi. It appears that no check was actually made. See SB 0167 attached as Exhibit 7.

3. Exhibit 12 to the Bokelkamp deposition, which is dated 6.29.04, states:

> "Despite personal guaranty of the two principals our access to the guarantor's additional collateral to support the debt is limited due to limited guaranty of principal spouses." See Exhibit 12 attached as Exhibit 8.

These Exhibits clearly demonstrate that Sovereign Bank was aware of legal issues relating to the requirement of Ann Gagliardi's Guaranty.

Moreover, there is no creditworthiness analysis within the files that is based upon any procedure, manual, or handbook. However, there is a document that was written by Bokelkamp on April 8, 2004, which <u>absolutely</u> suggests that Antonio Gagliardi was sufficiently creditworthy to support the business, i.e., the loan. Exhibit 19 to the Bokelkamp deposition states:

> "Anthony and Antonio show depth and some liquidity to assist the borrower in the present circumstances. Since their assets are either jointly owned, or owned through trusts, their assets are not easily attached by the Bank if collection is done via litigation."

In addition, Sovereign Bank produced document marked SB 0014, which has been inappropriately marked as confidential. It contains no confidential information, nevertheless it also provides this Court with sufficient basis to conclude that at the time of the Forbearance Agreement Sovereign Bank believed the guarantors were of considerable net worth. See

Exhibit 9 to deposition of Bokelkamp attached as Exhibit 4 in a separate envelope (5th paragraph).

This quote strongly suggests that the Court's finding that Antonio Gagliardi was not creditworthy may not be correct. The Court should keep in mind that a Exhibit 19 was written some 8 weeks before the July 16, 2004, closing. Certainly, this raises a serious issue as to the Court's decision. See Exhibit 19 attached as Exhibit 9.

The above quotes make clear that the long before July 16, 2004, the Sovereign Bank knew there were substantial legal issues relating to how to force Mrs. Ann Gagliardi into signing a Guaranty. Thus, the questions of the Plaintiff's counsel regarding the advice from Reimer & Braunstein concerning the Plaintiff's Guaranty does not stand alone in a vacuum. The Bank <u>absolutely</u> knew about the ECOA requirements because it has a check list. The Bank knew about the obstacles placed before it as a result of ECOA. Is it any wonder that Bokelkamp refused to testify even though he signed a affidavit which indicates that he relied on advice of a counsel? Is it any wonder that the spurious refusal to produce documents was made so as to "hide" these documents from the Court and the Plaintiff until this Court allowed the foreclosure to proceed?

<u>BOKELKAMP ADMITTED THAT HE NEVER CONSIDER ANY ISSUE RELATING TO MRS. ANN GAGLIARDI'S ASSETS</u>

Mr. Bokelkamp testified that he was unaware of any application for credit from Ann Gagliardi. See deposition of Bokelkamp, page 26, line 10 - 19. In addition, he testified that he **did not believe that Ann Gagliardi had supplied him with any information as a part of any application.**

> "Q. Did Ann Gagliardi make an application for credit in regard to the AMG loan to Sovereign Bank?
> A. Mr. McLaughlin, I don't believe that Ann Gagliardi has supplied me with any information as a part of an application to me as part of my relationship and my responsibility for dealing with this loan with AMG." See Bokelkamp deposition page 26 line 20 - page 27 line 17.

9

Certainly, under the provision of §202.7(d)(5), even if Sovereign Bank was to claim that it did not obtain Mrs. Gagliardi's Guaranty because of her role as the spouse of Antonio, Sovereign Bank could never prove that her Guaranty was "necessary to support the credit requested" by AMG because, as Bokelkamp stated, Sovereign Bank never consider her creditworthiness at all. See attached copy of Title 12 part 202 (Regulation B) ECOA as Exhibit 10.

### THE BOKELKAMP DEPOSITION REVEALS THAT MATERIAL MISREPRESENTATIONS WERE MADE TO THIS COURT BY SOVEREIGN BANK.

The Court must consider why Bokelkamp and Sovereign Bank attempt repeatedly to mislead the Court into believing that AMG and the guarantors sought an extension of credit and that they suggested the forbearance agreement. It was not AMG who sought the extension of credit or the forbearance agreement. It was Sovereign Bank. This is critically important as it relates to ECOA and virtually to every other Count in the Complaint. As the Court can see from the attached copy of Title 12 part 202 (Regulation B) ECOA anticipates that "an extension of credit is sought by the applicant." The actual request for extension of credit by an applicant is a fundamental component of a review of ECOA. What is clear from the Bokelkamp affidavit is that Sovereign Bank went to great lengths to convince the Court that AMG proposed the forbearance agreement. Para. 28 of Bokelkamp's affidavit states:

> "In or about June, 2004 AMG and the <u>guarantors</u> suggested a forbearance agreement… they also proposed giving the bank additional collateral… "

In reality, it was not the guarantors who suggested the forbearance agreement. In fact, Bokelkamp admitted during his deposition that he <u>never</u> met Antonio Gagliardi until the closing on July 16, 2004. See deposition of Bokelkamp, page 28, line 4 – page 29, line 6. Therefore, the guarantors, i.e., Antonio, could not have ever made a proposal. Nor did Mr. Bokelkamp ever receive from Mr. Gargliardi a signed application for the extension of credit

10

nor a signed personal financial statement. See deposition of Bokelkamp, page 30, line 3 - 23. Therefore, Bokelkamp's statement that the guarantors suggested the forbearance is materially false. Just as important is the fact that on September 17, 2004, the Bank produced a so called confidential document which clearly and unequivocally reveals that it was the Bank and only the Bank that proposed the forbearance agreement. See Exhibit 5 to deposition of Bokelkamp that is attached as Exhibit 11 in a separate envelope. The Bokelkamp Exhibit 5 has been inappropriately marked as confidential by Sovereign Bank counsel as "confidential", therefore, there has been made no direct quote from it in this Motion. This document was not provided until this Court's denial of Motion for Preliminary Injunction. Because it is marked confidential it is submitted to the court under the provisions of the Assented-To Protective Order. However, the Bokelkamp Exhibit 5 clearly contains no "proprietary or confidential" information and its inclusion in the "confidential documents" effectively prevented its discovery until after this Court's denial of Motion for Preliminary Injunction.)

    Exhibit 16 to the Bokelkamp deposition indicates:

> "Given the bulk of the guarantors assets are in trust or held jointly by spouse, every effort has been extended to obtain the promise pledge i.e. voluntarily." See Exhibit 16 to the deposition of Bokelkamp attached as Exhibit 12.

This language makes clear that the Bank had failed to get a voluntary proposal for the additional collateral. This, when combined with the above documents, brings into focus the level of misrepresentation by Sovereign Bank.

    Also Bokelkamp Exhibit 5 demonstrates that the Bank had determined that there was absolutely nothing on which to foreclose prior to obtaining the illegal Guaranty and Mortgage of Mrs. Gagliardi. See page 3 top bullet of Bokelkamp Exhibit 5. This of course explains why Sovereign Bank proposed the forbearance! It needed it to get Mrs. Ann Gagliardi's property. This information confirms what the Plaintiff had argued during the

Preliminary Injunction, i.e., there was only one reason for the Bank to sign the Forbearance Agreement and that was to obtain the Mortgage and the Guaranty from Mrs. Gagliardi. Sovereign Bank knew that the terms of the forbearance could not be met under any circumstances, indeed the sole purpose of the forbearance was to get Mrs. Ann Gagliardi's Guaranty and Mortgage. See depositon of Bokelkamp, page 227 line 3 - 12

> "Q. At the bottom of this document is the
> following sentence "the proposed forbearance is
> recommended at this time due to the sole benefit
> of additional collateral as the basis for the
> agreement."
> Do you see that?
> A. Yes.
> Q. Is that true?
> A. At that time, that was the sole benefit to the bank, yes."

A document dated 6.14.04 marked as SB 0101-SB 0109 on the bottom of page 2 states:

> "The proposed forbearance is recommended at this time due to the sole benefit of the additional collateral as the basis for the agreement." See attached as Exhibit 13.

Exhibit 13 to the deposition of Bokelkamp, dated June 28, 2005, on page 3 states:

> "The proposed forbearance is recommended at this time due to the sole benefit of the additional collateral as the basis for the agreement." Attached as Exhibit 5.

The deposition of Bokelkamp page 130, line 4 – 13

> Q. **Under "credit underwriting" it says
> "in 6-04, MAD charged off $1,000,000 based on
> the likelihood that there will be virtually no
> collateral proceeds to be realized from A/Rs,
> the only support for the bank's exposure is the
> additional real estate collateral obtained
> through the forbearance negotiations. The
> Sovereign Bank book balance is $801,000."**
> Is that correct?
> A. That's what that says, yes.

A document produced by Sovereign Bank, entitled Sovereign Bank Watched Asset Report dated 6.14.04, marked as SB 0410 – SB 0419, on page 2 states:

12

> "The banks strategy is to attempt to obtain the additional collateral from the guarantors, reducing the possible loss…" See attached as Exhibit 15.

All of the above quotes clearly indicate the Sovereign Bank has one and only one purpose in perpetrating its fraud on Mrs. Ann Gagliardi.

During the Bokelkamp deposition, Mr. Bokelkamp was repeatedly asked whether the Bank's proposal for guaranty of Ann Gagliardi was rejected by AMG. Mr. Bokelkamp categorically and repeatedly denied it was. See deposition of Bokelkamp, page 117, line 4 through page 118 line 15. However, Exhibit 7 to the Bokelkamp deposition, which is attached as Exhibit 15, is a July 8, 2004 email from Bokelkamp to Anthony Gagliardi which reveals that, as of one week before the closing, the guaranty from Ann had not been agreed to. Further, it appears that if it was EVER agreed to, it would have been agreed to by Anthony, rather than by Ann because Ann was not involved in any way in the negotiations, as Bokelkamp has already testified. It is critically important to note that Mr. Bokelkamp, in para. 30 of his affidavit, attempts to give the impression to this Court that Ann approved the Guaranty. In fact, what Bokelkamp says is "it was agreed that … Ann Gagliardi… would executed Limited Recourse Guaranty." However, during his deposition, Mr. Bokelkamp admitted that he had <u>never spoken to Ann Gagliardi prior to July 16, 2004 and never reviewed any application for credit from her</u>. See deposition of Bokelkamp, page 26, line 10 through 28, line 2. Any normal reading of Bokelkamp's affidavit indicates that great pains were taken to suggest that Ann Gagliardi had agreed to a guaranty when most certainly she had not. In fact, she was utterly unaware of the negotiations and content of her guaranty, as was her husband.

<u>THE BOKELKAMP DEPOSITION DEMONSTRATES THAT THE PLAINTIFF HAS A REASONALBE LIKELIHOOD OF SUCCESS ON THE MERITS IN CONNECTION WITH HER M.G.L.C.93A COUNT, FRAUD IN THE INDUCEMENT COUNT, INTENTIONAL INFLICTION OF THE EMOTIONAL DISTRESS COUNT, AND CONSPIRACY COUNT</u>

During the Bokelkamp deposition, he admitted that he had no reasonable expectation that AMG could comply with the terms of the Forbearance Agreement. See deposition of Bokelkamp, page 191 line 3 – 21

> "Q. Based upon what you knew about AMG as well as the guarantors as of the date of this forbearance agreement, was there any reasonable possibility that AMG and the guarantors would repay 2.6 million dollars to the bank by December 31st, 2004?
> A.  I don't think that there was the ability within the company to generate that kind of cash to pay us, no.  And as you know, the agreement contemplated a number of subsequent events.
> Q. I understand.  But I'm asking your reasonable expectation as of July 16th, 2004. Did you have a reasonable expectation as of that date that five and a half months hence, come December 31st, 2004, AMG and/or together with the guarantors were going to write the bank a 2.6 million dollars check?
> A.   I did not, no."

The above quote reveals that the true intentions of Sovereign Bank were to unfairly and deceptively cause Mrs. Ann Gagliardi to sign a Mortgage and a Guaranty to support the Forbearance Agreement which Sovereign Bank knew was illusory. As the Court is already aware the Forbearance Agreement as a conditional precedent required that additional real estate be given as collateral in amount not less then $1.6 million dollars. See the Forbearance Agreement. That Forbearance Agreement was signed on July 16, 2004. However, Bokelkamp unequivocally knew and understood that the property was not worth $1.6 million dollars but in fact was worth $1.2 million dollars **as Anthony Gagliardi had so stated.**

"The liens, a 1ˢᵗ or 2ⁿᵈ lien priority offer additional collateral value of approximately $1,200M, based upon the guarantors representations". See SB 0410-0419 (page 2 of 11, first paragraph) attached as Exhibit 14. Obviously, it is illusory to suggest in the Forbearance

14

Agreement that in exchange for Mrs. Ann Gagliardi's Mortgage and Guaranty and a mortgage on Framingham that the Bank will forbear provided that the new collateral is worth 1.6 million dollars when the Bank knew it was not. The deposition of Bokelkamp page 90 line 21 through page 91 line 12:

> "Q.  Is it fair to say that as of July
> 16th, 2004, the bank had an estimated value of
> the property, which was Framingham and
> Stoughton, that according to the bank was
> approximately 1.2 million dollars?
> MS. STONE:  Objection.
> A.  It would be my answer that I may have
> suggested that the value might be 1.2 million
> dollars in my reports that I write to my
> management.
> BY MR. McLAUGHLIN:
> Q.  Is it fair to say that you said that
> the amounts of 1.6 that had been proposed by the
> borrower should be discounted 25 percent?  Do
> you recall doing that?
> A.  I may have done that."

The deposition of Bokelkmap pape 94 line 3- 19 states:

> "Q.  Now, isn't it fair to say that at the
> time that this was signed you knew or had reason
> to believe that the property was not worth 1.6
> million dollars in the aggregate?
> A.  No, I wouldn't say that.  I would say
> that I wasn't confident in my ability as the
> bank to foreclose on the property and realize
> 1.6 million dollars.
> Q.  Isn't it, in fact, true that you have
> stated repeatedly in numerous internal documents
> that the additional collateral was not
> sufficient to secure the outstandings of the
> bank?
> MS. STONE:  Objection.
> A.  I think my documents stand for
> themselves.  I think you have them, they're part
> of the record."

The Restatement (Second) of Contracts § 76, "Conditional Promise," provides that: "A conditional promise is not consideration if the promisor knows at the time of making the

15

promise that the condition cannot occur." Comment b., "*Impossible Conditions*," explains that (emphasis added):

> "Words of conditional promise do not constitute a promise within the definition in § 2 if both promisor and promisee know that the condition cannot occur. If the promisor has such knowledge but the promisee does not, there may be a promise, but **the promisee receives only the false appearance of a commitment by the promisor**; in such cases the promise is not consideration for a return promise."

The Forbearance Agreement was an illusory and unenforceable contract, and therefore so was Mrs. Ann Gagliardi's Guaranty and Mortgage, because the Bank retained full and unfettered discretion as to whether or not to forbear, by virtue of section 10, which provides that it is "a condition precedent to the Lender's agreement to forbear as set forth herein [that] the Obligors shall provide additional collateral,' which "shall (i) have an aggregate realizable value . . . of no less than One Million Six Hundred Thousand dollars ($1,600,000), **and** (ii) **be in a form and substance acceptable to the lender in its sole and exclusive discretion.** (emphasis added). The Restatement (Second) of Contracts § 7, "Illusory And Alternative Promises," provides that: "A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances . . ." Comment a., "*Illusory pr*omises," explains that:

> "Words of promise which by their terms make performance entirely optional with the "promisor" do not constitute a promise. . . . In such cases there might theoretically be a bargain to pay for the utterance of the words, but in practice it is performance which is bargained for. **Where the apparent assurance of performance is illusory, it is not consideration for a return promise**."

Again, there can be a little doubt as to why the Bank raised a sudden issue of confidentiality when it refused to provide the Plaintiff with access to documents until after this Court's decision. More importantly, the "insider belief" that there was no reasonable

16

expectation that the Forbearance Agreement could be complied with, as Bokelkamp stated, is unequivocally linked to the fact that Bokelkamp having decided that the property was worth $1.2 million dollars knew that it was his decision and only his decision as to whether or not to agree to the value of the property of $1.6 million dollars. See the Forbearance Agreement. This results in nothing short of a contract that has a build in impossibility of performance component so as to ensure that the Bank got Mrs. Gagliardi's Guaranty and Mortgage, even though there was no possible chance that AMG could comply with Forbearance Agreement.

### THE DISCOVERY TAKEN AFTER THIS COURT'S DENIAL OF PRELIMINARY INJUNCTION DEMONSTRATES THAT ANN GAGLIARDI HAS A REASONABLE LIKELIHOOD ON MERITS BOTH AS RELATES TO ECOA CLAIM AND ALL OTHER CLAIMS

The Plaintiff respectfully suggests that this Court's denial failed to consider the various Supplemental Memoranda filed by the Plaintiff after the hearing. Prior to this Honorable Court's Order, the Plaintiff filed with this Court, a Memorandum in Support its Motion for Preliminary Injunction based upon First Plaintiff's Amended Complaint and Demand for Jury Trial. After this Court's inquiry into the applicability of the Equal Credit Opportunity Act (ECOA), during the hearing, the Plaintiff then filed a Supplemental Memorandum (hereinafter referred as Supplemental Memorandum), on September 9, 2005. On or about September 15, 2005, the Plaintiff obtained in discovery a copy of the Credit Report, a very critical document. Based upon this document, the Plaintiff provided this Honorable Court with an Additional Supplemental Memorandum in Support of Plaintiff's Motion for Preliminary Injunction on September 21, 2005.

A review of the Court's Order reveals that the Court did not discuss any of the issues raised by the Plaintiff in the Supplemental Memoranda that were submitted after the hearing. The Court may have elected to disregard the arguments, however, it is also possible that the Court did not have the opportunity to consider the issues raised in those Supplemental

17

Memoranda. The Plaintiff believes that those issues are dispositive and that the Appeals Court will so find.

The Bank's conduct toward Mrs. Gagliardi, and its failure to reveal to her what its true intention were in taking her Guaranty and Mortgage, was unfair and deceptive under M.G.L.c. 93A. If the Bank had told her what its true intentions were, she would not have given her guaranty and mortgage. "[A] practice is 'deceptive," for purposes of G.L. c. 93A, "if it 'could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.' " *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 777 (1980), quoting *Lowell Gas Co. v. Attorney Gen.*, [377 Mass. 37, 50 (1979]. In the same vein, . . . conduct is deceptive if it possesses "a tendency to deceive." *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 394 (2004). Mrs. Ann Gagliardi, particularly with full discovery and further opportunity to demonstrate the Bank's lack of truthfulness, has a strong likelihood of establishing that the Bank violated 93A in its dealings with her.

In this regard, even Mrs. Ann Gagliardi was unable to establish each technical element of an ECOA claim, or the if the Bank could establish a technical defense (none of which is conceded), the Bank's conduct could nevertheless be found to violate 93A, because, in the totality of the circumstances, its falls at least "within at least the penumbra of [ECOA's] established concept of unfairness," and was "immoral, unethical, oppressive, or unscrupulous," *PMP Associates, Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). *See also VMark Software, Inc. v. EMC Corp.,* 37 Mass.App.Ct. 610, 620 (1994) ("To be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the anti-heroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness."); *Selski, Inc. v. Bassett*, 2004 WL 2424300, *4 (Mass.Super.) to 2004 WL 2424300, *5 (Mass.Super.) (Agnes. J.) ("93A proscribes conduct

18

that does not necessarily correlate with whether a defendant has complied with or violated other statutes, regulations, or common law requirements.")

## THE FORECLOSURE WILL CAUSE IRREPUTABLE HARM

"It is well-settled law in this Commonwealth that real property is unique and that money damages will often be inadequate to redress a deprivation of an interest in land." *Greenfield Country Estates Tenants Ass'n., Inc. v. Deep*, 423 Mass. 81, 88, 666 N.E.2d 988, 993 (1996). As the Land Court recently made clear: "Land is unique. . . . A claimant to land, or to its use or occupation, wants some assurance that possession or use of that land will still be an available remedy at the conclusion of the case should he or she prevail on the merits. Ordinarily, such assurance would be achieved by a preliminary injunction prohibiting the transfer or further encumbrance of the land. *Waters v. Cook*, 2005 WL 2864806, *2 (Mass. Land Ct.).

Likewise, "the purpose of a preliminary injunction is to maintain the situation in status quo until the merits can be determined." *Burlington Sand & Gravel, Inc. v. Town of Harvard*, 31 Mass.App.Ct. 261, 266 (1991), quoting *Thayer Co. v. Binnall*, 326 Mass. 467, 479 (1950). Preservation of the status quo, by enjoining the foreclosure on Mrs. Ann Gagliardi's property scheduled for November 22, 2005 on a mere 14 days' notice, is the only fair result in this case in which there are critical, unresolved discovery disputes, where trial on the merits could take place in a matter of months, and where the Bank would not suffer one bit of harm, mush less irreparable harm, by permitting an adjudication of Mrs. Ann Gagliardi's claims on the merits – before going forward with a foreclosure, in the unlikely event it prevails. See Nolan & Henry, 9A Mass. Prac. Series § 49.1, "Temporary Restraining Orders and Preliminary Injunctions":

> There are occasions when an aggrieved party needs immediate relief.
> When such a need arises, it is open to him to seek the equitable power
> of a court to order the defendant to do or to cease doing something

> which is then or is about to cause the plaintiff serious harm. If a mortgage foreclosure is about to be consummated and the mortgagor can demonstrate that it is wrongful . . the mortgagor . . . may seek a temporary restraining order . . . to preserve the rights of the party seeking it until there is a hearing.

## CONCLUSION

Given all of the above and considering the devastating impact of the November 22, 2005, foreclosure, the Plaintiff respectfully requests that the Court immediately enter an order enjoining the foreclosure pending the outcome of the Appeal to the First Circuit. The Court's initial denial was made without the Plaintiff having the benefit of any discovery. Now, discovery has already provided disturbing evidence that Sovereign Bank has not been forthcoming with document discovery, deposition testimony and this Court has yet to act on the pending Motion to Compel Production of Documents and for Sanction. The Plaintiff will be filing a Second Motion to Compel dealing with Bokelkamp's refusal to answer the deposition questions.

Respectfully Submitted,

Mrs. Ann Gagliardi,
By her counsel,

**LAW OFFICES OF MICHAEL C. MCLAUGHLIN**

Dated: November 17, 2005   By:   /s/ Michael C. McLaughlin, Esq.
(BBO# 367350)
One Beacon Street, 33rd Floor
Boston, MA 02108
(617) 227-2275