UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANN GAGLIARDI
    Plaintiff

v.                                           Civil Action No.
                                           05-10859-NG

SOVEREIGN BANK
    Defendant

## DEFENDANT'S OPPOSITION TO EMERGENCY MOTION FOR PRELIMINARY INJUNCTION PENDING APPEAL

Defendant Sovereign Bank ("Sovereign") opposes the Emergency Motion for Preliminary Injunction Pending Appeal filed by plaintiff Ann Gagliardi for the numerous reasons that follow. The motion seeks to restrain a foreclosure of commercial property located at 331 Page Street in Stoughton, Massachusetts jointly owned by plaintiff Ann Gagliardi and her husband Antonio Gagliardi. The Stoughton property is collateral securing guaranties of loans made to AMG Construction Company, Inc. ("AMG") a company run by the Gagliardis' son, Anthony. There is another piece of property in Framingham, Massachusetts which secures another guaranty of the loan. The Framingham property is not the subject of this federal court action.

I.     The Emergency Motion seeks reconsideration.

The Emergency Motion is, essentially, a motion for reconsideration. The U.S. District Court made its decision to deny plaintiff's motion for preliminary injunction on September 28, 2005. The Court had a full record; the decision followed oral argument on September 1, 2005 and the submission of (1) plaintiff's Motion for Preliminary Injunction, Memorandum and Affidavit filed March 31, 2005, (2) defendant's Opposition

to Motion for Preliminary Injunction and Affidavit filed July 8, 2005, (3) plaintiff's Supplemental Memorandum filed August 26, 2005, (4) plaintiff's second Supplemental Memorandum filed September 9, 2005, (5) plaintiff's Supplemental Memorandum filed September 21, 2005, and (6) defendant's Reply to Plaintiff's Three Supplemental Memoranda filed September 27, 2005. The Court rendered a 10 page decision on September 28, 2005 setting forth the relevant facts and law, and denied a preliminary injunction because plaintiff had not shown she was likely to succeed on the merits of her federal claim under the Equal Credit Opportunity Act ("ECOA") and the state law claims. The Court found that the bank's "request for the signature of a spouse for the purpose of creating a valid user does not constitute marital discrimination under ECOA." Memorandum and Order, p. 9. Now plaintiff is trying again to mount a claim under ECOA and halt the foreclosure she previously failed to stop.

In an effort to make the present Emergency Motion look like something other than a motion for reconsideration, plaintiff claims that it is based on newly discovered "facts" which could not have been learned earlier, and the matter now requires emergency consideration. The fact is that plaintiff has waited until the last minute to file her motion, and any exigency created thereby is entirely her own doing.

II.   Plaintiff has had ample opportunity for discovery.

Sovereign produced 1,502[1] pages of documents on October 17, 2005, as soon as the Assented-To Protective Order was filed (docket #34). Copies were delivered to counsel for the plaintiff on or about October 20, 2005, but he did not review them. Approximately two weeks later, counsel called the undersigned and asked when the

---

[1] Of the 1,502 pages produced, only 31 were designated "Confidential" under the Assented-to Protective Order.

2

documents would be delivered. When it was pointed out that they already had been delivered, he agreed that he had them but simply had not looked at them.

Plaintiff's counsel case never noticed a deposition of any bank witness in this case. Instead, the deposition was noticed in the related state court case, *Sovereign Bank v. AMG Construction Company, Inc., Antonio Gagliardi and Anthony Gagliardi*, Civil Action No. 05-0190-B. The parties agreed that deposition testimony from the bank's witness could be used in both the state and federal case. Although the deposition was held with relatively little advance notice, the bank produced Bret Bokelkamp as a witness on November 9, 2005. He was ready to start at 9:30 a.m., but the deposition started late because plaintiff's counsel arrived after the agreed upon start time. The deposition continued until 4:05 p.m. Plaintiff states in her Emergency Motion that there have been only 3 hours of deposition, but this is puzzling, because the deposition lasted nearly the entire day. The bank also offered to continue the Rule 30 (b)(6) deposition on either of the following two business days, November 10 or 14, but plaintiff's counsel declined the offer. Plaintiff should not be heard to complain that certain questions were not answered, when he was given the opportunity to take more deposition testimony.

With regard to attorney-client privilege, the witness refused to answer questions about the substance of his communications with Reimer & Braunstein, the firm that represented the bank in connection with the forbearance. He relied on their advice, but reliance does not amount to a waiver of the privilege protecting the substance of the advice.

Plaintiff also complains that the bank has objected to producing policy manuals. There is no testimony that Mr. Bokelkamp, the bank officer who handled the forbearance,

relied on policy manuals to analyze the creditworthiness of any of the Gagliardis. He is an experienced work out officer, having begun his banking career in 1982, and has ample experience to analyze borrower's and guarantor's creditworthiness for debts of $2.6 million. So far as the record shows, plaintiff's need for any policy manuals is entirely illusory.[2]

III. Legal Points

Plaintiff asserts various legal arguments. A brief overview of the factual background will provide the context for the arguments. In 2001 Sovereign entered into a loan arrangement with AMG. The bank's security for the loan consisted of AMG's business assets including its accounts receivable. There were two unlimited guarantors of the loan, Anthony Gagliardi, president, director and 70% shareholder of AMG, and his father Antonio Gagliardi, the company's founder, vice president, director and 30% shareholder. Both men were married and owned their residences jointly with their wives. In 2001, when the loan was first made, neither wife was a guarantor.

In 2004, the loan went into default.[3] The default arose because AMG's eligible accounts receivable, which were used in calculating how much AMG was entitled to borrow under the revolving line of credit, declined precipitously. The eligible accounts and the availability under the line of credit, as reported by AMG itself, were:

| Date | Eligible AR | Net Availability |
|---|---|---|
| as of 12-12-03 | $2,749,751 | $372,573 |
| as of 2-5-04 | $2,433,579 | ($494,232) |
| as of 4-15-04 | $1,262,238 | ($1,562,456) |

---

[2] This issue, among others, is briefed in a motion to compel and opposition thereto, now pending before the U.S. District Court.
[3] There had been prior defaults of a less critical nature.

4

|  |  |  |
|---|---|---|
| as of 5-15-04 | $757,102 | ($1,966,565) |
| as of 6-9-04 | $779,022 | ($1,949,029) |

In the first two months of 2004, AMG drew more under the line of credit than was available, and then the receivables dipped by over $1 million. The cash flow from AMG's operations was no longer enough to secure the bank or allow for any more advances. What had been a secured loan was by this time severely under secured.

In this connection, Sovereign assessed the financial condition of the guarantors based on the personal financial statements submitted by Anthony and his wife, and Antonio and his wife, and concluded that the guarantors (Anthony and Antonio) held no assets separate from their spouses, and that substantial portions of their declared net worth was in the form of beneficial interests in trusts. The bank officers concluded, in internal bank documents, that given the joint and trust ownership of assets, there was "no legal path by which the bank can attach these assets without possible third party defenses being raised." Plaintiff quotes this language on page 7 of her Emergency Motion and then misconstrues it to make it seem as though Sovereign believed there was no legal path to plaintiff's property and so determined that it had to violate ECOA.

Although Antonio was an unlimited guarantor, the bank had no collateral from him before he pledged additional collateral in connection with the forbearance agreement. If the bank had to try to reach his assets under his unlimited guaranty, it would have been in the position of reaching assets he owned jointly with his wife, who was not a guarantor before the forbearance. Both their residence at 311 South Street in Weston and the commercial property at 331 Page Street in Stoughton are owned as tenants by the entirety. The bank would not be able to satisfy the debt from their residence because of the tenancy by the entirety. See M.G.L. c. 209, § 1. The bank also knew that reaching

5

the Stoughton property would be difficult because it was held jointly and would have to be partitioned[4]. The bank correctly anticipated some of the legal challenges it might face if forced to satisfy the debt from Antonio's assets. This is simply good analysis of the circumstances surrounding the debt; it is not in any way evidence that the bank wanted to do anything contrary to ECOA or other legal standards.

On July 16, 2004 Sovereign, AMG and the three Gagliardi family members executed a forbearance agreement, mortgages and guaranties. The company was given time to produce a business plan, obtain bonding, and generally get its affairs in order so that it could repay the debt. Although the bank was entitled to pursue its legal rights because of the defaults, it decided to give the company time to make an orderly repayment of the debt. Part of the consideration for the forbearance was the additional collateral consisting of the Stoughton and Framingham properties. As the U.S. District found, "[t]he bank would have had little reason to agree to the forbearance in 2004 absent Ms. Gagliardi's mortgage and guaranty, which helped ensure that Sovereign's 'overall loss exposure [was not] increased' by the new agreement." Memorandum and Order, p.8.

Instead of getting its affairs in order, AMG ran into difficulties with a public construction job in Avon. Ultimately, AMG was fired from the job, and the bonding company had to come in and complete the work, thus scuttling any possibility that accounts receivable from the job would be available to pay the bank. Although this was a significant event, the company did not come forward and tell the bank; it let the bank read about it in the newspaper.

---

[4] Because the Stoughton property is a commercial office building and not the Gagliardi's principal residence, the tenancy by the entirety form of ownership is equivalent to a joint tenancy. The tenancy by the entirety form of ownership protects property from seizure by a creditor only if it is the principal residence of the nondebtor spouse. M.G.L. c. 209, § 1.

In addition, the company's CPA admitted, after the fact, that the company's financial results had changed for the worse and would have to be restated.

The loss of the Avon job, the bonding company's assumption of responsibility for completing the job, and AMG's failure to communicate with the bank all constituted events of default. In addition, AMG's business consultant informed the bank that AMG had not obtained bonding. Inability to obtain bonding constituted another event of default. After several unsuccessful attempts to reach AMG, the bank commenced suit in state court and foreclosures on the collateral. Ann Gagliardi commenced this separate lawsuit alleging a violation of ECOA.

A.   Plaintiff was not forced or defrauded.

Plaintiff's Emergency Motion distorts the bank's statements, and claims they evidence a decision by the bank that it would have to "force" plaintiff into signing a guaranty.

Plaintiff was not "forced" to sign anything. Instead, she and her husband agreed to put up the Stoughton property as collateral for guaranties of the loan in exchange for the bank's agreement to forbear from enforcing its rights in connection with the defaulted loan of the company their son was running. All the parties were represented by counsel, Edward Quinlan, an attorney who has represented AMG for many years.[5]

Mr. Quinlan sent a memo directly to Bret Bokelkamp proposing terms for forbearance. *See Exhibit 2*. The memo specifically proposed that the debt be secured by mortgages on Ann's and Antonio's Stoughton property, as well as other property in Framingham. The bank had previously discussed taking additional collateral, but Mr.

---

[5] Mr. Quinlan produced 531 pages of documents pursuant to a subpoena *duces tecum*. A select few illustrating his representation of AMG and the Gagliardis with regard to the forbearance, along with documents produced by others, are attached as *Exhibit 1*.

Quinlan's proposal of June 10 was the foundation for the forbearance agreement that eventuated a month later. Mr. Quinlan also proposed that $1.6 million of the total debt be classified as secured by real estate, thus obtaining more favorable terms for that portion of the debt and enhancing the company's ability to get bonding for public construction jobs.

The documents are replete with evidence of Mr. Quinlan's representation of plaintiff. In response to Mr. Quinlan's proposal, Reimer & Braunstein prepared draft documents, including the limited guaranty to be signed by Ann Gagliardi, and the mortgage to the Stoughton property, and sent them to Mr. Quinlan for comment. On June 30, 2004, Mr. Quinlan told Reimer & Braunstein he needed to review the documents "particularly those affecting Ann Gagliardi with the individuals." *See AMG 0175, part of Exhibit 1.*

The next day, July 1, 2004, Mr. Quinlan emailed his comments on Ann's guaranty back to Reimer & Braunstein. *See Quinlan email to Mark Scott dated July 1, 2004, forwarded to Bret Bokelkamp, part of Exhibit 1.* On July 2, 2004, Reimer & Braunstein emailed back a revised draft of Ann's guaranty. *See Quinlan 531, part of Exhibit 1.* On July 8, 2004 Bret Bokelkamp emailed Anthony directly about some open issues including the guaranty from Ann, and asked Anthony to review the issues with Ed Quinlan. *See AMG 0302, part of Exhibit 1.* On July 15 Reimer & Braunstein emailed all the documents to Mr. Quinlan, including Ann's limited guaranty and the mortgage and assignment of rents to be executed by Ann and Antonio, so he could give them a final review before closing the next day. *See Quinlan 535, part of Exhibit 1.* Mr. Quinlan spent several hours that day reviewing the closing documents, according to his invoice.

*See Exhibit 3.* His only comment back to Reimer & Braunstein, after extensive review of the documents, was to request a slight change in the mortgages, and to add his name and address to the section designating the individual who is to receive a copy of any legal notice. *See Quinlan email to Scott, July 15, 2004, part of Exhibit 1.* Also on July 15 Reimer & Braunstein asked Mr. Quinlan about the Gagliardis' availability for closing the next day. *See Quinlan 40, part of Exhibit 1.*

On July 16, 2004, Mr. Quinlan attended the closing at Reimer & Braunstein's offices with the three Gagliardis: Ann, Antonio and Anthony. According to his invoice, he had "conferences with Anthony Gagliardi, Antonio Gagliardi and Ann Gagliardi re: loan documents and related transactions." *See Exhibit 3.* After the closing, Mr. Quinlan wrote to all three Gagliardis – Anthony, Ann and Antonio – and gave his opinion that the forbearance documents they had just signed would "permit the Company to work itself out of its current financial predicament and hopefully achieve a level of stability which would allow further renegotiation of the loans and agreements." He also advised the Gagliardis, concerning the Stoughton and the Framingham properties, that "both of these real estate parcels can be refinanced" within certain limits, if AMG was not in default. *See Exhibit 4.* Clearly, plaintiff's interests were protected by counsel. In addition, plaintiff had access to financial information about AMG through Mr. Quinlan and other professional advisors, and her son, daughter and husband, all of whom were involved with the company.

B.  Plaintiff still has not shown an ECOA violation.

The U.S. District Court has already found that "requiring a spousal signature does not violate the [Equal Credit Opportunity Act] where the creditor legitimately demands additional collateral to secure the loan." Memorandum and Order, p. 9.

In her Emergency Motion, plaintiff tries to reargue her ECOA claim, and reasserts that she was not a joint applicant within the meaning of Regulation B. The law is clearly to the contrary. Antonio and Ann Gagliardi jointly owned the property at 331 Page Street in Stoughton. At the inception of the loan, Antonio had executed an unlimited guaranty, and he and his wife agreed to keep the property free of liens. During the parties' negotiation of the forbearance, it was agreed that the jointly owned property would become collateral. Ann's status as a co-owner of the property meant that she was considered a "joint applicant" under Regulation B, along with her husband who already was an unlimited guarantor. *See Midlantic National Bank v. Hansen*, 48 F. 3d 693 (3d Cir. 1995), cited with approval by the Supreme Judicial Court *Baybank v. Bornhofft*, 427 Mass. 571, 694 N.E. 2d 854 (1998), holding that a husband's and wife's joint ownership of an asset used to collateralize a loan is sufficient to constitute a joint application by the spouses. Therefore, the regulation's prohibition on requiring the signature of a spouse who is not a joint applicant does not even come into play, because she is considered, as a legal matter, a "joint applicant."

IV.  Plaintiff fails to allege or make a factual showing of any state law violation.

In connection with various state law claims, plaintiff suggests that the bank perpetrated a fraud on Ann Gagliardi because it estimated that the property it was

receiving as collateral was worth only $1.2 million, rather than $1.6 million. The figure of $1.6 million originated with Mr. Quinlan, as his forbearance proposal had suggested that $1.6 million of the debt be classified as debt secured by real estate (*Quinlan 83, part of Exhibit 4*). From the bank's point of view, the appraised values would have to support that value, and the forbearance agreement required that appraisals be conducted. The obligors themselves represented market values greatly in excess of $1.6 million. Antonio and Ann's personal financial statement placed a market value of $1.5 million on the Stoughton property alone, and the statement of Anthony and his wife gave a value of $1.2 million for the Framingham property. (*Exhibit 5*). The bank's own analysis was more conservative, and estimated it would receive 25% less than the market value if they sold at foreclosure. Any difference in perceived values is simply a result of the bank's conservative approach to estimating value, not because of any c.93A violation, or fraud, or other state law claim.

V.   Conclusion

This Emergency Motion is nothing more than a motion for reconsideration. It takes documents and deposition testimony and through distortion and lack of context, attempts to illustrate an ECOA problem. There was no ECOA violation when the U.S. District Court first heard this matter, and there is none now. A secured creditor is entitled

11

to have both owners of jointly owned property sign documents, as the Court already found. The Emergency Motion should be denied.

DEFENDANT
SOVEREIGN BANK
by its attorney,

*/s/ Kathleen C. Stone*
Kathleen C. Stone
BBO# 481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050

November 18, 2005

## CERTIFICATE OF SERVICE

I certify that on the 18th day of November 2005 I caused to be delivered a copy of the foregoing, by hand, to:

Michael C. McLaughlin, Esq.
Law Offices of Michael C. McLaughlin
One Beacon Street
Boston, MA 02108

Kathleen C. Stone

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.